COLUMBIA  BROADCASTING  SYSTEM,  INC.  *v.*
UNITED STATES ET AL.

No.  1026.  Argued  May  1,  1942.—Decided  June  1,  1942.

*Mr. Charles E. Hughes, Jr.,* with whom *Messrs. John J. Burns, Allen S. Hubbard, Harold L. Smith,* and *Richard W. Hogue, Jr.* were on the brief, for appellant.

*Mr. Telford Taylor,* with whom *Solicitor General Fahy* and *Messrs. Robert L. Stern, Richard S. Salant, Charles R. Denny, Harry M. Plotkin,* and *Max Goldman* were on the

brief, for the United States et al.; and *Mr. Louis G. Caldwell*, with whom *Messrs. Leon Lauterstein, Emanuel Dannett, and Percy H. Russell, Jr.* were on the brief (*Mr. Donald C. Beelar* entered an appearance), for the Mutual Broadcasting System, Inc.,—appellees.

MR. CHIEF JUSTICE STONE delivered the opinion of the Court.

The Federal Communications Commission, by its order of May 2, 1941, as amended by its order of October 11, 1941, promulgated regulations which purport to require the Commission to refuse to grant a license to any broadcasting station which enters into certain defined types of contract with any broadcasting network organization. These regulations, it is alleged, affect adversely appellant's contractual relations with broadcasting stations and impair its ability to carry on its business in maintaining and operating its nationwide broadcasting network. The regulations as amended on October 11, 1941, together with a supplemental "minute" promulgated by the Commission on October 31, 1941, are set forth at the end of this opinion, *post*, p. 425. The question for our decision is whether appellant is entitled to secure a judicial review of the order by a suit brought under § 402 (a) of the Communications Act of 1934, 48 Stat. 1093, 47 U. S. C. § 402 (a), and the Urgent Deficiencies Act, 38 Stat. 219, 28 U. S. C. § 47.

Pursuant to § 402 (a) appellant brought the present suit against the United States in the Southern District of New York, to enjoin enforcement of the Commission's order as contrary to the public interest and beyond the Commission's statutory authority, and on the further ground, if the order be deemed within that authority, that the statute is an unconstitutional delegation of legislative power by Congress in violation of Article I, § 1 of the Constitution, and operates to deprive appellant of property

without due process of law in violation of the Fifth Amendment. The case was heard by a court of three judges, which permitted the Commission and the Mutual Broadcasting Company to intervene as defendants. It granted appellees' motion to dismiss the complaint for want of jurisdiction, 44 F. Supp. 688, and stayed the operation of the Commission's order pending direct appeal to this Court.

In 1938 the Communications Commission authorized an investigation "to determine what special regulations applicable to radio stations engaged in chain or other broadcasting are required in the public interest, convenience, or necessity." Extensive hearings were held by a committee consisting of three members of the Commission, at whose request the national networks, including appellant, intervened. In June, 1940, the committee made a report, on the basis of which briefs were filed and oral argument was presented before the full Commission by the three national networks and other interested parties. In May, 1941, the Commission issued its "Report on Chain Broadcasting" and ordered the adoption of the regulations which, in their amended form, are the subject of the present controversy.

The relevant facts stated in the bill of complaint are as follows: Appellant or its predecessor has been engaged in the business of nationwide network or chain broadcasting since 1927. It has a large amount of physical property used in the business and has built up a valuable goodwill. For its broadcasts it maintains a staff of employees and expends large amounts for musicians and broadcasting performers. It has commitments by long-term contracts aggregating more than $4,000,000 for broadcasting expenditures, including those for the use of land and buildings and for the furnishing of news and broadcasting programs in the next few years. Appellant's total property devoted to its broadcasting business exceeds $18,000,000 in value;

its earnings from the network exceeded $3,000,000 in both 1939 and 1940.

Chain broadcasting is the means by which radio programs are made available to all or a large part of the nationwide radio audience. It is defined by the Communications Act, 47 U. S. C. § 153 (p), as the "simultaneous broadcasting of an identical program by two or more connected stations." The chain broadcaster prepares radio programs, for which it engages performers in advance, and simultaneously broadcasts them over a large number of radio stations to which the programs are transmitted from some central point of origination by wire telephone lines leased by the broadcaster, here the appellant. The programs, which are prepared well in advance of the broadcast and given by persons employed for the purpose by appellant, are of two classes—commercial programs sponsored and paid for by advertisers, and sustaining programs furnished by appellant and not paid for by any advertiser.

Appellant's network comprises 123 stations in 122 cities in the United States. It is so operated as to enable ninety per cent of the radio audience of the United States to listen simultaneously to programs provided by appellant and broadcasted over these stations. Appellant owns and operates seven of the stations and leases an eighth, all licensed by the Commission. With the remaining 115 stations it enters into individual contracts, usually for periods of five years, terminable in some instances by appellant on twelve months' notice. By these contracts, appellant undertakes to furnish each station with an average of at least sixty hours per week of network sustaining and sponsored programs. The sustaining programs are furnished without charge, the station being free to use them or not as it chooses. Appellant undertakes to furnish the station with all commercial programs which the sponsor requests the station to broadcast and to pay the station a specified

hourly rate for the use of its facilities in broadcasting such programs. Appellant agrees not to furnish its programs to other stations in the same city; the affiliated station, with exceptions not now material, agrees not to broadcast the program of any other network. Of critical importance in the present litigation is the stipulation of the affiliated station that it will, upon not less than twenty-eight days' notice from appellant, broadcast the sponsored or commercial program furnished to it by appellant for at least fifty "converted" hours (averaging seventy-nine regular clock hours) per week.

These provisions of appellant's contracts are alleged to be indispensable to the maintenance and efficient operation of its network and to the existence of a strong and efficient network broadcasting system, and necessary to enable appellant to compete with other advertising media. On May 2, 1941, the Commission issued its order which, as amended by its order of October 11, 1941, promulgated the "Chain Broadcasting Regulations" of which appellant complains, and which the Commission characterized in its Report as "the expression of the general policy we will follow in exercising our licensing power." [1] The regulations provide that no license shall be granted to a broadcast

---

[1] The Commission in its Report says, p. 85:

"We believe that the announcement of the principles we intend to apply in exercising our licensing power will expedite business and further the ends of justice.

"Announcements of policy may take the form of regulations or of general public statements. In either case, the applicant's right to a hearing on the question whether he does in fact propose to operate in the public interest is fully preserved. The regulations we are adopting are nothing more than the expression of the general policy we will follow in exercising our licensing power. The formulation of a regulation in general terms is an important aid to consistency and predictability and does not prejudice any rights of the applicant. Good administrative practice would seem to demand that such a statement of policy or rules and regulations be promulgated wherever sufficient information is available upon which they may be based."

station having contracts with a network organization, containing any of several provisions which are characteristic of appellant's contracts with its affiliates. These include provisions by which the station is prevented from broadcasting the programs of any other network organization (3.101); or which prevent another station serving substantially the same area from broadcasting the network programs not taken by the station applying for license, or prevent another station serving a substantially different area from broadcasting any program of the network organization (3.102); or by which the station contracts for affiliation with the network for a period longer than two years (3.103); or by which the station "options for network programs any time subject to call on less than 56 days' notice or more time than a total of three hours" within each of four specified segments of the broadcast day, the regulation declaring "such options may not be exclusive as against other network organizations and may not prevent or hinder the station from optioning or selling any or all of the time covered by the option, or other time, to other network organizations" (3.104); or which prevent the station (a) from rejecting network programs which the station reasonably believes to be unsatisfactory or unsuitable or (b) from substituting for the network program a program of outstanding local or national importance (3.105).

After making its order of May 2, 1941, the Commission deferred its effective date until further order. By its order of October 11, 1941, the Commission fixed the effective date as November 15, 1941, and directed "that the effective date of Regulation 3.106 with respect to any station may be extended from time to time in order to permit the orderly disposition of properties," and "that the effective date of Regulation 3.107 shall be suspended indefinitely and any further order of the Commission placing said Regulation 3.107 in effect shall provide for not less

than six months' notice and for further extension of the effective date from time to time in order to permit the orderly disposition of properties."

The bill of complaint also alleges that the purpose and effect of the regulations are to prohibit station licensees from having agreements of the kind which appellant has with its affiliates; that prior to the order of May 2, 1941, it was the practice of the Commission to renew the licenses of stations annually and that the licensed stations have had a reasonable expectancy of the annual renewal of their licenses; that 115 licensed stations have such contracts with appellant, expiring at various times between the original effective date of the regulations and December 31, 1947. It is alleged that when their current licenses expire, at the latest, and perhaps earlier through the revocation of existing licenses, such stations face the loss of their licenses if they perform or continue in force or renew any existing contracts containing the described provisions.

The bill alleges that since the stations fear the loss of their licenses, as a result of the regulations, they will not negotiate for or renew affiliation contracts containing such provisions. And because they fear the loss of their licenses, the stations have threatened to cancel and repudiate their affiliation contracts, and many have notified appellant that they will not be bound by their contracts after the regulations become effective. As a consequence, appellant's ability to conduct its business and maintain its public broadcasting service is seriously impaired and the regulations will make the operation of appellant's business more costly, reduce its earnings and render its property and business less valuable.

The bill of complaint was filed October 30, 1941. The following day the Commission promulgated a supplemental "minute" setting up a procedure by which the validity of the regulations might be tested upon application for a license by an individual licensee. The minute declared

that if a station wished to challenge the regulations the Commission would grant a temporary extension of its license until there had been a final court determination of the issues. In the event of such litigation, and if the validity of the regulations were sustained, "the Commission will nevertheless grant a regular license to the licensee, otherwise entitled thereto, who has unsuccessfully litigated that issue, if the licensee thereupon conforms to the decision."

An affidavit subsequently submitted by appellant in support of its motion for a temporary injunction states that since the Commission's minute of October 31st, appellant has continued to receive indications that its affiliates will cancel and repudiate their contracts and refuse to renew them, and has received no indication that the minute has or will have the effect of inducing stations to assume the burden of testing the validity of the regulations. Attached to the affidavit are letters from five affiliates, written after October 31st, indicating their intention not to be bound by the contracts. The affidavit also states appellant's belief that it would have received more such letters had it not been for its circulation of information concerning the pendency of this suit.

Accepting the allegations of the complaint as true, as for present purposes we must, it is evident that applicacation by the Commission of its regulations in accordance with their terms would disrupt appellant's broadcasting system and seriously disorganize its business. As the bill alleges, station licenses have been renewable by the Commission annually,[2] whereas appellant's contracts are for five year periods and many of them will survive the expiration of the existing licenses to the affiliated stations. Under Regulations 3.101, 3.102, 3.103 and 3.104, each affili-

---

[2] On October 11, 1941, the Commission amended Regulation 3.34 to make the normal license period two years.

ate must repudiate his contract or be denied the renewal of his license. In either case, this would deprive appellant of the station's participation in its network, for which its contracts call.

Regulation 3.104 not only requires all options by appellant to be exercised on 56 days' rather than 28 days' notice as at present, but provides that no option time is exclusive of other networks, and thus allows to appellant no option time within which it can command the use of affiliated stations for any program for broadcasting on a national scale. These sections together thus operate to break down the network enterprise in which appellant and its affiliates are by their contracts coöperating, and to substitute a system in which every station is available to every network on a "first come first served basis."

The Commission concedes by its brief that, as provided by § 312 (a), "Any station license may be revoked . . . because of conditions revealed by such statements of fact as may be required [of a licensee] from time to time which would warrant the Commission in refusing to grant a license on an original application." Consequently the regulations by their terms, read in conjunction with § 312 (a), expose licensees, who renew their affiliation contracts, to revocation proceedings by the Commission whenever, upon a statement which the Commission may require, it appears that the licensee has entered into an affiliation contract which the regulations proscribe.

A proceeding to set aside an order of the Commission under § 402 (a) and the Urgent Deficiencies Act is a plenary suit in equity. Hence the questions raised by the motion to dismiss are whether the Commission's order is an "order," review of which is authorized by § 402 (a) of the Act, and if so whether the bill states a cause of action in equity. The suit cannot be maintained unless both questions are answered in the affirmative.

Section 402 (a) makes applicable the provisions of the Urgent Deficiencies Act to "suits to enforce, enjoin, set aside, annul, or suspend any order of the Commission" except orders "granting or refusing an application for a construction permit for a radio station, or for a radio station license, or for renewal of an existing radio station license, or for modification of an existing radio station license, or suspending a radio operator's license." Review of the orders excepted from § 402 (a) is by appeal to the Court of Appeals of the District of Columbia under the provisions of § 402 (b). See *Scripps-Howard Radio* v. *Federal Communications Comm'n, ante,* p. 4. Since the Commission's order neither grants, denies nor modifies any license, any review in advance or independently of an application for a station license must be under § 402 (a), and then only if the Commission's order promulgating the regulations is an "order" within the meaning of this section. The particular label placed upon it by the Commission is not necessarily conclusive, for it is the substance of what the Commission has purported to do and has done which is decisive. *Powell* v. *United States,* 300 U. S. 276, 284–85; *A. F. of L.* v. *Labor Board,* 308 U. S. 401, 408.

The Commission's investigation of the contractual relations between the networks and the stations, which resulted in the order now under attack, was for the stated purpose of prescribing regulations of such relationships. The order authorizing the investigation recited that the proceeding was taken under § 303 (i) of the Act, which gives the Commission "authority to make special regulations applicable to radio stations engaged in chain broadcasting." Since the Commission is not in terms given authority to regulate contractual relations between the stations and the networks, regulation of them could be accomplished only by regulating licensed radio stations which participate in chain broadcasting. It was by regulations in terms applicable to such stations that the Com-

mission sought to control their contractual relationships with the networks.

The order is thus in its genesis and on its face, and in its practical operation, an order promulgating regulations which operate to control such contractual relationships, and it was adopted by the Commission in the avowed exercise of its rule-making power. Such regulations which affect or determine rights generally, even though not directed to any particular person or corporation, when lawfully promulgated by the Interstate Commerce Commission, have the force of law and are orders reviewable under the Urgent Deficiencies Act. *Assigned Car Cases,* 274 U. S. 564; *United States* v. *B. & O. R. Co.,* 293 U. S. 454. And regulations of like character, by which the Communications Commission has prescribed generally the records and accounts to be kept by telephone companies subject to its jurisdiction, are similarly reviewable under § 402 (a). *A. T. & T. Co.* v. *United States,* 299 U. S. 232.

The regulations here prescribe rules which govern the contractual relationships between the stations and the networks. If the applicant for a license has entered into an affiliation contract, the regulations require the Commission to reject his application. If a licensee renews his contract, the regulations, with the sanction of § 312 (a), authorize the Commission to cancel his license. In a proceeding for revocation or cancellation of a license, the decisive question is whether the station, by entering into a contract, has forfeited its right to a license as the regulations prescribe. It is the signing of the contract which, by virtue of the regulations alone, has legal consequences to the stations and to appellant. The regulations are not any the less reviewable because their promulgation did not operate of their own force to deny or cancel a license. It is enough that failure to comply with them penalizes licensees, and appellant, with whom they contract. If an administrative order has that effect it is reviewable and it

does not cease to be so merely because it is not certain whether the Commission will institute proceedings to enforce the penalty incurred under its regulations for noncompliance. *Assigned Car Cases, supra; A. T. & T. Co. v. United States, supra.*

The regulations are rules which in proceedings before the Commission require it to reject and authorize it to cancel licenses on the grounds specified in the regulations without more. If the regulations are valid they alter the status of appellant's contracts and thus determine their validity in advance of such proceedings. By striking them down by a determination proclaimed in advance that licenses shall be cancelled or refused because of a previous failure to comply with the regulations, they impose a penalty and sanction for noncompliance far more drastic than the fines customarily inflicted for breach of reviewable administrative orders.

Most rules of conduct having the force of law are not self-executing but require judicial or administrative action to impose their sanctions with respect to particular individuals. Unlike an administrative order or a court judgment adjudicating the rights of individuals, which is binding only on the parties to the particular proceeding, a valid exercise of the rule-making power is addressed to and sets a standard of conduct for all to whom its terms apply. It operates as such in advance of the imposition of sanctions upon any particular individual. It is common experience that men conform their conduct to regulations by governmental authority so as to avoid the unpleasant legal consequences which failure to conform entails. And in this case it is alleged without contradiction that numerous affiliated stations have conformed to the regulations to avoid loss of their licenses with consequent injury to appellant.

Such regulations have the force of law before their sanctions are invoked as well as after. When, as here, they

are promulgated by order of the Commission and the expected conformity to them causes injury cognizable by a court of equity, they are appropriately the subject of attack under the provisions of § 402 (a) and the Urgent Deficiencies Act. *A. T. & T. Co.* v. *United States, supra; Rochester Telephone Corp.* v. *United States,* 307 U. S. 125; *Interstate Commerce Comm'n* v. *Goodrich Transit Co.,* 224 U. S. 194; *Kansas City So. Ry. Co.* v. *United States,* 231 U. S. 423; *Assigned Car Cases, supra; Chicago, R. I. & P. Ry. Co.* v. *United States,* 284 U. S. 80; *United States* v. *B. & O. R. Co., supra.*

It is no answer to say that the regulations are addressed only to the Commission and merely prohibit it from granting—and authorize it to cancel—licenses in the case of all stations entering into such contracts, and that accordingly all stations are left free to enter into contracts or not, as they choose. They are free only in the sense that all those who do not choose to conform to regulations which may be determined to be lawful are free by their choice to accept the legal consequences of their acts. Failure to comply with the regulations entails such consequences to the station owner and to appellant. These are the loss of the affiliated stations' licenses if they adhere to their contracts, and disruption of appellant's network through the declared unlawfulness of the contracts, if the regulations are valid.

The purposes sought to be accomplished by § 402 (a) and the Urgent Deficiencies Act would be defeated if a suitor were unable to resort to them to avoid reasonably anticipated irreparable injury resulting from such legal consequences of the Commission's order, merely because the Commission as yet has neither refused to renew a license, as the regulations require, nor cancelled a license, as the regulations permit. Such an argument addressed to the form rather than the substance of the order was rejected in *Powell* v. *United States, supra* [300 U. S. 276];

cf. *A. F. of L.* v. *Labor Board, supra,* 308 U. S. 408. The *Powell* case likewise repudiates the suggestion that, merely because the order is not in terms addressed to those whose rights are affected, they cannot seek its review. See also *Western Pacific R. Co.* v. *Southern Pacific Co.,* 284 U. S. 47; *Claiborne-Annapolis Ferry Co.* v. *United States,* 285 U. S. 382.

The order here is not one, as the Government argues and as the court below seemed to think, where the complainant's rights are affected only on the contingency of future administrative action, as in *United States* v. *Los Angeles & S. L. R. Co.,* 273 U. S. 299; cf. *Rochester Telephone Corp.* v. *United States, supra,* 307 U. S. 130. As the Court declared in the *Los Angeles* case, 309, 310, reviewable orders are "an exercise either of the quasi-judicial function of determining controversies or of the delegated legislative function of rate making and rule making." And the Court pointed out that the "so-called order" in that case did not "determine any right or obligation" or change the plaintiff's "existing or future status or condition," and that it was "merely the formal record of conclusions reached after a study of data collected in the course of extensive research conducted by the Commission" and "is the exercise solely of the function of investigation."

Here the Commission exercised its rule-making power by adopting regulations whose operation is not made subject to future administrative determinations, save only as the Commission may be called on to decide in any given case whether a station's contract with a network is within the regulations. The regulations' applicability to all who are within their terms does not depend upon future administrative action. Instead, they operate to control such action and to determine in advance the rights of others affected by it. The Commission gave its own recognition

that such is their operation by its successive postponements of the effective date of the order for a period now expired, and by its suspension of Regulations 3.106 and 3.107, in order to enable the networks to dispose of their properties.

Of course, the Commission was at liberty to follow a wholly different procedure. Instead of proclaiming general regulations applicable to all licenses, in advance of any specific contest over a license, it might have awaited such a contest to declare that the policy which these regulations embody represents its concept of the public interest. As a matter of sound administrative practice, both the rule-making proceeding and the specific license proceeding undoubtedly have much to commend them. But they are by no means the same, nor do they necessarily give rise to the same kind of judicial review. Having adopted this order under its rule-making power, the Commission cannot insist that the appellant be relegated to that judicial review which would be exclusive if the rule-making power had never been exercised and consequently had never subjected appellant to the threatened irreparable injury.

The court below assumed that if appellant had any equitable cause of action, it must be prosecuted in an ordinary suit and not under the provisions of the Urgent Deficiencies Act. But we think this mistakes both the nature of the regulations and the purpose of suits under that Act, as incorporated in § 402 (a). Such a cause of action obviously can arise only because of the operation of the regulations. The regulations are the effective implement by which the injury complained of is wrought, and hence must be the object of the attack. It is because they are an exercise of the rule-making power, and because they presently determine rights on the basis of which the Commission is required to withhold licenses and au-

thorized to cancel them, that there is an order within the meaning of § 402 (a) and the Urgent Deficiencies Act.

The Commission argues that, since its Report characterized the regulations as announcements of policy, the order promulgating them is no more subject to review than a press release similarly announcing its policy. Undoubtedly, regulations adopted in the exercise of the administrative rule-making power, like laws enacted by legislatures, embody announcements of policy. But they may be something more.. When, as here, the regulations are avowedly adopted in the exercise of that power, couched in terms of command and accompanied by an announcement of the Commission that the policy is one "which we will follow in exercising our licensing power," they must be taken by those entitled to rely upon them as what they purport to be—an exercise of the delegated legislative power—which, until amended, are controlling alike upon the Commission and all others whose rights may be affected by the Commission's execution of them. The Commission's contention that the regulations are no more reviewable than a press release is hardly reconcilable with its own recognition that the regulations afford legal basis for cancellation of the license of a station if it renews its contract with appellant.

Appellant's standing to maintain the present suit in equity is unaffected by the fact that the regulations are not directed to appellant and do not in terms compel action by it or impose penalties upon it because of its action or failure to act. It is enough that, by setting the controlling standards for the Commission's action, the regulations purport to operate to alter and affect adversely appellant's contractual rights and business relations with station owners whose applications for licenses the regulations will cause to be rejected and whose licenses the regulations may cause to be revoked. *Chicago Junction Case,* 264 U. S. 258, 266–68; *Western Pacific R. Co.* v.

*Southern Pacific Co., supra; Claiborne-Annapolis Ferry Co.* v. *United States, supra;* compare, in the case of an attack upon the validity of a statute, *Truax* v. *Raich,* 239 U. S. 33, 38–39; *Pierce* v. *Society of Sisters,* 268 U. S. 510.

What we have said of the allegations of the complaint, and of the effect of the Commission's order if those allegations are sustained upon the trial, is enough to establish the threat of irreparable injury to appellant's business and to show also that the injury can not be avoided, as the Commission suggests, by appellant's intervention in proceedings upon applications for renewal of licenses by its affiliates or in proceedings to cancel their licenses, if and when such proceedings are instituted. Appellant has sufficiently alleged that the affiliates are cancelling or threatening to cancel their contracts in order to conform to the regulations. It is to avoid the irreparable injury which would result from such wholesale cancellations of its contracts, induced by the force of the regulations, that appellant makes its attack on them now rather than in later proceedings on the individual applications for licenses in those cases, if any, in which the stations are willing to seek licenses without complying with the prerequisites laid down by the regulations.

The issues in such a proceeding are not necessarily the same as the issues here. Intervention in it would afford appellant no assurance either of an adjudication of appellant's contentions or that the action of other stations would be governed by it. Moreover, if the Commission's order is, as we hold, a reviewable order, appellant is free to seek review under § 402 (a). It is not thereby, as the court below seemed to think, improperly substituting a different procedure and court for that which Congress has prescribed for the trial of like issues so far as they may be raised on review of an order denying a license. Such issues may likewise be involved in a proceeding, upon the Commission's own motion, for modification or cancellation

of a license, which concededly is reviewable under § 402 (a). See *Scripps-Howard Radio* v. *Federal Communications Comm'n, ante,* p. 4. But review of the order by a licensee in such a proceeding affords no adequate remedy. If ever instituted, which is uncertain, it would come too late to save appellant from the injury wrought by the outlawry of its contracts.

Nor does the Commission's minute, filed after the present suit was brought, afford an adequate basis for requiring appellant to seek relief by intervention in a proceeding on application for a license reviewable under § 402 (b). In that event the minute would not operate to broaden the issues involved in the renewal application. Nor would it afford a basis for restraining enforcement of the regulations as to other affiliated stations, pending adjudication of the validity of the regulations. Without full exploration of the subject, such as can be had only at the trial, we cannot say that the minute will afford a sufficient inducement to persuade the affiliated stations to cease cancellations and assume the initiative in litigating the validity of the regulations and of the contracts which they undertake to condemn. The affidavit filed in the court below on the application for a stay is to the contrary. And in any case, we are of the opinion that there are no equitable principles by which the right of appellant, upon the showing made by its complaint and affidavit, to test the order under § 402 (a) can justly be suspended to await action which the station owners may or may not take in assuming the burden of challenging the regulations.

We need not stop to discuss here the great variety of administrative rulings which, unlike this one, are not reviewable—either because they do not adjudicate rights or declare them legislatively, or because there are adequate administrative remedies which must be pursued before resorting to judicial remedies, or because there is no occasion to resort to equitable remedies. But we should

not for that reason fail to discriminate between them and this case in which, because of its peculiar circumstances, all the elements prerequisite to judicial review are present. The ultimate test of reviewability is not to be found in an overrefined technique, but in the need of the review to protect from the irreparable injury threatened in the exceptional case by administrative rulings which attach legal consequences to action taken in advance of other hearings and adjudications that may follow, the results of which the regulations purport to control.

We conclude that the Commission's promulgation of the regulations is an order reviewable under § 402 (a) of the Act, and that the bill of complaint states a cause of action in equity. The stay now in effect will be continued, on terms to be settled by the court below.

*Reversed.*

MR. JUSTICE BLACK took no part in the consideration or decision of this case.

Orders and regulations of the Federal Communications Commission, considered in the foregoing opinion of the Court:

ORDER OF MAY 2, 1941, AS AMENDED OCTOBER 11, 1941

Now, therefore, it is hereby ordered, That the following regulations be and they are hereby adopted:

SEC. 3.101. *Exclusive affiliation of station.*—No license shall be granted to a standard broadcast station having any contract, arrangement, or understanding, express or implied, with a network organization under which the station is prevented or hindered from, or penalized for, broadcasting the programs of any other network organization.

SEC. 3.102. *Territorial exclusivity.*—No license shall be granted to a standard broadcast station having any contract, arrangement, or understanding, express or implied, with a network organization which prevents or hinders

another station serving substantially the same area from broadcasting the network's programs not taken by the former station, or which prevents or hinders another station serving a substantially different area from broadcasting any program of the network organization. This regulation shall not be construed to prohibit any contract, arrangement, or understanding between a station and a network organization pursuant to which the station is granted the first call in its primary service area upon the programs of the network organization.

SEC. 3.103. *Term of affiliation.*—No license shall be granted to a standard broadcast station having any contract, arrangement, or understanding, expressed or implied, with a network organization which provides, by original term, provisions for renewal, or otherwise for the affiliation of the station with the network organization for a period longer than two years: *Provided,* That a contract, arrangement, or understanding for a period up to two years, may be entered into within 120 days prior to the commencement of such period.

SEC. 3.104. *Option time.*—No license shall be granted to a standard broadcast station which options for network programs any time subject to call on less than 56 days' notice, or more time than a total of three hours within each of four segments of the broadcast day, as herein described. The broadcast day is divided into 4 segments, as follows: 8:00 a. m. to 1.00 p. m.; 1:00 p. m. to 6:00 p. m.; 6:00 p. m. to 11:00 p. m.; 11:00 p. m. to 8:00 a. m. Such options may not be exclusive as against other network organizations and may not prevent or hinder the station from optioning or selling any or all of the time covered by the option, or other time, to other network organizations.

SEC. 3.105. *Right to reject programs.*—No license shall be granted to a standard broadcast station having any contract, arrangement, or understanding, express or implied, with a network organization which (a), with respect to programs offered pursuant to an affiliation contract, prevents or hinders the station from rejecting or refusing network programs which the station reasonably believes to be unsatisfactory or unsuitable; or which (b), with respect to network programs so offered or already con-

tracted for, prevents the station from rejecting or refusing any program which, in its opinion, is contrary to the public interest, or from substituting a program of outstanding local or national importance.

SEC. 3.106. *Network ownership of stations.*—No license shall be granted to a network organization, or to any person directly or indirectly controlled by or under common control with a network organization, for more than one standard broadcast station where one of the stations covers substantially the service area of the other station, or for any standard broadcast station in any locality where the existing standard broadcast stations are so few or of such unequal desirability (in terms of coverage, power, frequency, or other related matters) that competition would be substantially restrained by such licensing.

SEC. 3.107. *Dual network operation.*—No license shall be issued to a standard broadcast station affiliated with a network organization which maintains more than one network: *Provided,* That this regulation shall not be applicable if such networks are not operated simultaneously, or if there is no substantial overlap in the territory served by the group of stations comprising each such network.

SEC. 3.108. *Control by networks of station rates.* — No license shall be granted to a standard broadcast station having any contract, arrangement, or understanding, express or implied, with a network organization under which the station is prevented or hindered from, or penalized for, fixing or altering its rates for the sale of broadcast time for other than the network's programs.

[*Effective date.*] These regulations shall become effective immediately: *Provided,* That, with respect to existing contracts, arrangements or understandings, or network organization station licenses, the effective date shall be deferred until November 15, 1941: *Provided further,* That the effective date of Regulation 3.106 with respect to any station may be extended from time to time in order to permit the orderly disposition of properties; and *Provided further,* That the effective date of Regulation 3.107 shall be suspended indefinitely and any further order of the Commission placing said Regulation 3.107 in effect shall provide for not less than six months' notice and for

further extension of the effective date from time to time in order to permit the orderly disposition of properties.

THE MINUTE OF OCTOBER 31, 1941

The Commission today adopted the following minute setting forth the procedure that it will follow in applying the policies announced in the Chain Broadcasting Regulations:

If a station wishes to contest the validity of the Chain Broadcasting Regulations adopted in Docket No. 5060, or the reasonableness of their application to the particular station, its license will be set for hearing. In order to insure that the station may remain on the air and be in no way injured by any such Commission proceeding and appeal to court from a decision in such proceeding, the Commission will grant such licensee a temporary extension of its license, with renewals from time to time until there has been a final determination of the issues raised at such hearing. In the event of such litigation, and if the validity of the application of the Chain Broadcasting Regulations to such licensee is sustained by the courts, the Commission will nevertheless grant a regular license to the licensee, otherwise entitled thereto, who has unsuccessfully litigated that issue, if the licensee thereupon conforms to the decision.

The supplementary decision and order in Docket No. 5060 indefinitely suspended Regulation 3.107, relating to the operation of more than one network by a single network organization. No similar suspension was made of that portion of Regulation 3.106, relating to network operation of more than one standard broadcast station with substantially overlapping service areas. The Commission will postpone indefinitely any action to prevent such dual station operation if it is shown that the operation of two stations in any city is indispensable to the continued operation of two networks by a single network organization.

The adoption of the foregoing procedure is without prejudice to the rights of any person who may petition the Commission for modification or stay of the Chain Broadcasting Regulations.

MR. JUSTICE FRANKFURTER, dissenting:

The criteria governing judicial review of "orders" under the Urgent Deficiencies Act were defined by a unanimous Court in *United States* v. *Los Angeles & S. L. R. Co.*, 273 U. S. 299, 309–10: "The so-called order here complained of is one which does not command the carrier to do, or to refrain from doing, any thing; which does not grant or withhold any authority, privilege or license; which does not extend or abridge any power or facility; which does not subject the carrier to any liability, civil or criminal; which does not change the carrier's existing or future status or condition; which does not determine any right or obligation." If "broadcasting company" were substituted for "carrier," this analysis of the legal consequences of the action of the Interstate Commerce Commission in the *Los Angeles* case would fit perfectly the legal consequences of the action of the Federal Communications Commission in making public the challenged regulations.

The fact that an action of an administrative agency occasions even irreparable loss does not in itself afford sufficient grounds for judicial review. Even if the Commission committed a wrong, the question of judicial reviewability still remains that put in the *Los Angeles* case, 273 U. S. at 313, to wit, is it "a wrong for which Congress provides a remedy under the Urgent Deficiencies Act" of October 22, 1913, 38 Stat. 208, 219, as incorporated in § 402 (a) of the Communications Act of 1934?

For Congress has not authorized resort to the federal courts merely because someone feels aggrieved, however deeply, by an action of the Federal Communications Commission. A District Court of the United States can take a case only when Congress has authorized that type of case to be taken. Congress did not leave opportunity for reviewing damaging action by the Federal Communica-

tions Commission to the general equity powers of the district courts. It circumscribed the power of the courts in relation to the Commission in the most detailed way. Its incorporation by reference, in the Communications Act of 1934, of the scope of review allowed in reviewing an "order" of the Interstate Commerce Commission gave all the precise, definite, and technical boundaries which the concept of a reviewable "order" had acquired through the decisions of this Court prior to the enactment of the Communications Act. The precise requirements of an "order" of the Commission for purposes of judicial review are therefore as inflexible as though they were written into the Act itself.

Our problem, then, is this: Does the issuance of the chain broadcasting regulations constitute an "order" reviewable in a proceeding brought under § 402(a) of the Communications Act, in the light of the settled rules for determining what such an "order" is when a determination of the Interstate Commerce Commission is made the basis of judicial review. It is therefore necessary to put out of mind what this case is not. It is not the invocation of equity jurisdiction in order to avoid threatened irreparable harm resulting from the criminal enforcement of an unconstitutional statute, as in *Pierce* v. *Society of Sisters*, 268 U. S. 510. Nor do we have here a resort to equity because it is essential for the protection of asserted rights that criminal prosecutions unauthorized by law be restrained, as in *Shields* v. *Utah Idaho R. Co.*, 305 U. S. 177, 183.

In promulgating these regulations the Communications Commission merely announced its conception of one aspect of the public interest, namely, the relationship of certain provisions in network-affiliation contracts to the obligation of a station licensee to render the most effective service to the listening public. The regulations themselves

determine no rights. They alter the status of neither the networks nor licensees. As such they require nobody—neither the networks, the licensees, nor the Commission—to do anything. They are merely an announcement to the public of what the Commission intends to do in passing upon future applications for station licenses. No action of the stations or the networks can violate the regulations, for there is nothing the regulations require them to do or refrain from doing.

Announcements of general policies intended to be followed by administrative agencies customarily take any one of various forms. Sometimes they are noted in the agency's annual report to Congress, sometimes in a public announcement or press release, and sometimes, as was the case here, they are published as "rules" or "regulations." See Final Report of the Attorney General's Committee on Administrative Procedure (1941), pp. 26–27. But whatever form such announcements may take, their nature and effect is the same. The reason why the Commission formulated its chain broadcasting policy in the form of a "regulation" is given in its report: "We believe that the announcement of the principles we intend to apply in exercising our licensing power will expedite business and further the ends of justice. . . . Good administrative practice would seem to demand that such a statement of policy or rules and regulations be promulgated wherever sufficient information is available upon which they may be based." Report on Chain Broadcasting, Federal Communications Commission, Order No. 37, Docket No. 5060, p. 85.

With respect to its jurisdiction over matters relating to radio broadcasting, the Communications Commission is essentially a licensing agency. Its regulatory power over the industry is derived, for the most part, from its authority to grant and withhold station licenses. Under § 309

of the Communications Act of 1934 the Commission is required to examine each application for a station license and to determine in each case whether a grant would serve public interest, convenience, or necessity. As was noted in *Federal Communications Commission* v. *Pottsville Broadcasting Co.*, 309 U. S. 134, 138, the Act "expresses a desire on the part of Congress to maintain, through appropriate administrative control, a grip on the dynamic aspects of radio transmission." To that end, Congress established an administrative procedure under which the Commission must make a specific determination in each case whether the public interest would be served by granting the particular application before it. No announcement of general licensing policy can relieve the Commission of its statutory obligation to examine each application for a license and determine whether a grant or denial is required by the public interest.

The Commission recognized this fact in issuing these regulations. It explicitly stated that a determination of the requirements of the public interest will, in spite of the regulations, still have to be made in passing upon particular applications: "Announcements of policy may take the form of regulations or of general public statements. In either case, the applicant's right to a hearing on the question whether he does in fact propose to operate in the public interest is fully preserved. The regulations we are adopting are nothing more than the expression of the general policy we will follow in exercising our licensing power. The formulation of a regulation in general terms is an important aid to consistency and predictability and does not prejudice any rights of the applicant." Report on Chain Broadcasting, *supra,* p. 85.

Subsequent to the promulgation of the regulations, the Commission found that substantial modifications were necessary. In its supplemental report on these amend-

ments, the Commission gave further evidence of the flexible nature of the regulations: "The Commission stands ready at all times to amend and modify its regulations upon the petition of any network, national or regional, or any station or group of stations if it can be shown that those regulations prevent profitable network operations, or unduly disturb any aspect of broadcasting, or that because of special or changed circumstances the chain broadcasting regulations should not be applicable to any particular situation." Moreover, in its Minute of October 31, 1941, designed primarily to protect the interests of station licensees who contest the validity of the regulations, the Commission again made it abundantly clear that the regulations were not final: "If a station wishes to contest the validity of the Chain Broadcasting Regulations . . ., or the reasonableness of their application to the particular station, its license will be set for hearing."

The regulations do not, therefore, commit the Commission to any definitive course of action in passing upon applications for licenses. Consistently with the regulations (and, parenthetically, consistently with the authority of the Commission to depart from general regulations where such departure is in the public interest, see *Radio Commission* v. *Nelson Bros. Co.*, 289 U. S. 266, 285), the Commission is free to dilute them with amendments and exceptions. The construction of the regulations and their application to particular situations is still in the hands of the Commission. Administrative adjudication is still open. Before its completion it is not ripe for judicial review.

The characteristics of the administrative determinations in all the cases on which the Court's opinion relies were wholly different. In each one the force of the law, either through criminal prosecution or injunction or fine or some other judicial remedy, could immediately be brought to

bear to enforce the command of the administrative agency. In none of the cases was an administrative action held reviewable which in itself entailed no immediate legal consequences.

Thus, in the *Assigned Car Cases*, 274 U. S. 564, suit was brought under the Urgent Deficiencies Act to annul an order of the Interstate Commerce Commission prescribing for all railroads within its jurisdiction a rule governing distribution of cars for the transportation of bituminous coal. Under § 402 of the Transportation Act of 1920, 41 Stat. 456, 476, 49 U. S. C. § 1 (12) (14), the carriers were required "to make just and reasonable distribution of cars," and the Commission was authorized to "establish reasonable rules, regulations, and practices with respect to car service by carriers by railroad." Failure of a carrier to comply with such regulations issued by the Commission was declared unlawful, subjecting the carrier to a fine of $100 for each offense. Since the order of the Commission commanded carriers to take specified actions, and since the failure to comply with the order would bring immediate legal sanctions, the order was held reviewable.

Similarly, in *United States* v. *B. & O. R. Co.*, 293 U. S. 454, the Interstate Commerce Commission required railroads subject to its jurisdiction to equip locomotives with a suitable type of power-operated reverse gear. The Boiler Inspection Act, 36 Stat. 913, 916, expressly provided that violation by a carrier of any rule or regulation issued by the Commission under the Act was punishable by a fine recoverable in a civil action. A suit under the Urgent Deficiencies Act to set aside the Commission's order was therefore entertained.

*A. T. & T. Co.* v. *United States*, 299 U. S. 232, was a suit under § 402 (a) of the Communications Act of 1934, the same provision upon which jurisdiction of the present litigation is based, to set aside an order of the Federal Communications Commission prescribing a uniform system of

accounts for telephone companies within the Act. Section 220 (a) authorized the Commission to prescribe such forms of accounts, and § 220 (d) made the failure or refusal of a company to keep accounts in the manner prescribed by the Commission unlawful, punishable by a $500 forfeiture for each day of the continuance of the offense. Because of the legal sanctions immediately attaching upon its violation, the order was held reviewable.

In *Interstate Commerce Comm'n* v. *Goodrich Transit Co.,* 224 U. S. 194, the Commission, under the authority vested in it by § 20 of the Interstate Commerce Act, issued orders prescribing forms of accounts, records, and memoranda and calling for annual reports of carriers by water. Section 20 (7) made it unlawful for such carriers to keep any accounts other than those prescribed by the Commission. A suit to set aside the orders was therefore entertained. Similarly, in *Kansas City So. Ry.* v. *United States,* 231 U. S. 423, suit was brought to annul regulations of the Interstate Commerce Commission prescribing a uniform bookkeeping and accounting system for interstate railway carriers. Since carriers who failed to keep accounts as ordered by the regulations were subject to penalties under § 20 (7) of the Act, jurisdiction was taken. And in *Chicago, R. I. & P. Ry. Co.* v. *United States,* 284 U. S. 80, the Interstate Commerce Commission prescribed car-hire settlement rules governing use by common carriers of each other's cars. Violation of such rules by carriers was declared unlawful and subject to fines. Consequently, a suit to set aside the rules was entertained.

Of course, the mere fact that an administrative order determines a status does not mean that it is not reviewable. If an administrative determination of status has the effect of subjecting a person to legal obligations, whether embodied in statute or previously formulated administrative commands, or otherwise affecting legal rights, such a determination possesses the elements of a

reviewable order. Thus, in *Rochester Telephone Corp.* v. *United States,* 307 U. S. 125, the Federal Communications Commission had issued orders requiring all telephone carriers subject to the Communications Act of 1934 to file schedules of their charges, copies of contracts with other carriers, etc. Section 203 (e) of the Act provides that a carrier which fails or refuses to comply with such rules of the Commission shall forfeit $500 for each offense, and $25 for each day of its continuance. After investigation and hearing, the Commission determined that the Rochester Telephone Corporation was a telephone carrier subject to the Act and therefore subject to the previously promulgated general orders directed to carriers within the Commission's jurisdiction. "The order of the Communications Commission in this case was therefore reviewable. It was not a mere abstract declaration regarding the status of the Rochester under the Communications Act, nor was it a stage in an incomplete process of administrative adjudication. The contested order determining the status of the Rochester necessarily and immediately carried direction of obedience to previously formulated mandatory orders addressed generally to all carriers amenable to the Commission's authority. Into this class of carriers the order under dispute covered the Rochester, and by that fact, in conjunction with the other orders, made determination of the status of the Rochester a reviewable order of the Commission." *Rochester Telephone Corp.* v. *United States,* 307 U. S. at 143–44. Compare *A. F. of L.* v. *Labor Board,* 308 U. S. 401, 408. Unlike the action taken by the Federal Communications Commission in the *Rochester* case, its action here carried no directions of obedience of any kind to anyone.

It is said that the regulations derive legal effect through § 312 (a) giving the Commission authority to revoke licenses, and that "by virtue of the regulations alone," the networks and their affiliates are now subjected to legal

detriment. But this is merely another way of phrasing the main contention that the regulations at once and without further action by the Commission release legal sanctions. But the regulations have no such effect. To be sure, the Commission can revoke a station license "because of conditions revealed by such statements of fact as may be required from time to time which would warrant the Commission in refusing to grant a license on an original application." But the Commission may never require a licensee to file a statement of fact under § 312 (a); its provisions may therefore never come into operation. In any event, the regulations as such do not subject licensees to any sanctions. A license can be revoked under § 312 (a) because of the licensee's failure to operate its station in the public interest, as required by the statute. The regulations adopted by the Commission cannot operate to revoke any licenses. It is only after a proceeding has been started (in which the licensee is entitled to a hearing during which the revocation order is suspended) and adversely concluded against a party that legal sanctions come into play—the Commission can bring proceedings to enforce its order of revocation and, correspondingly, the licensee can bring suit under § 402 (a) challenging the validity of the Commission's termination of the license.

Section 502 of the Communications Act provides that the violation of "any rule, regulation, restriction, or condition made or imposed by the Commission under authority of this Act" shall be a criminal offense. Would the renewal by a licensee of its network-affiliation contract subject it to the criminal penalties imposed by § 502? Obviously not, for the regulations do not forbid a licensee from taking that or any other action. And, for the same reason, a license could not be revoked under the provision of § 312 (a) which authorizes revocation "for violation

of or failure to observe . . . any regulation of the Commission authorized by this Act. . . ." If the Commission had issued regulations which ordered licensees to do or refrain from doing something, the problem would be entirely different. Violation by a licensee of such a regulation would be grounds for revocation of its license, under § 312 (a), and for the imposition of criminal penalties, under § 502. And, the other requisites being present, such a regulation could be reviewed as a final administrative determination.

This leaves only the suggestion that since the action taken by the Commission, although not the completion of its adjudicatory process, nevertheless drastically affects substantial business interests, it is proper for the courts to intercede at this stage. Even if this argument were to be considered as if it had never before been made to and rejected by this Court, its infirmities are obvious. As a practical matter, the impact upon the business operations of the networks and their affiliated stations would probably be as disturbing as if the policies formulated in the regulations had been expressed through a press release, or if only the report, which is not only the foundation of the regulations but also embodies them, had been published without the regulations which are only the summary of the report, or if Congress itself had incorporated these regulations into the text of the Communications Act. It will hardly be argued that any of these steps could be the subject of judicial review before the Commission acted upon particular applications. But assume that the greater formality given to the announcement of the Commission's statement of policy through the regulations intensified the practical business consequences. Congress has not conferred upon the district courts jurisdiction over "practical business consequences." They can review action of administrative

agencies only when there is an "order," and when Congress in § 402 (a) made only an "order" of the Communications Commission reviewable, it incorporated the settled doctrine established by an unbroken series of decisions in this Court that the courts could review only a final determination by an agency whereby its administrative process has been concluded.

This is not the first time that the federal courts have been urged to sit in judgment upon "practical business consequences" where the action to be reviewed did not represent the final stage of administrative adjudication. The arguments made in this case have been made in the past but heretofore have always been rejected by this Court. The classic formulation and application of the doctrine of finality as to orders under the Urgent Deficiencies Act was contained in *United States* v. *Los Angeles & S. L. R. Co.,* 273 U. S. 299. In view of the thoroughness of the argument at the bar, and the weightiness of the opinion, that case has ever since been regarded as furnishing the guideposts in this field of law. It should govern here.

Suit was brought there to annul and enjoin an order of the Interstate Commerce Commission determining the final valuation for rate-making purposes of the Los Angeles & Salt Lake Railroad Company, which operated a thousand miles of railroad lines. The valuation fixed by the Commission was $45,200,000; the carrier claimed that, if the Commission had employed proper standards of valuation, the figure would be $70,000,000, a difference of $24,800,000. At the time suit was brought, approximately 250,000 miles of railroad lines throughout the country were undergoing valuation. The validity of the criteria employed by the Commission in the case of the Los Angeles & Salt Lake Railroad Company was therefore of enormous national significance. In the words of

Commissioner Eastman, "This case deals with an issue of greater moment to the country than any that we have ever determined." 75 I. C. C. 523. These issues, involving practically every phase of valuation law, were canvassed in an adversary proceeding before the Commission lasting nearly a year and a half, resulting in a report of one hundred and forty pages, and expressed in a formal "order" of ten pages. Counsel for the railroad company there, as do counsel for the broadcasting company here, relied upon the practical finality of the order as a basis for review: "As a practical matter, the Commission in any and all proceedings in which it has occasion to use this valuation will give it not *prima facie* but conclusive effect. In the valuation proceeding before the Commission which resulted in this order petitioner introduced its evidence of the value of the properties and the proceeding resulted in a valuation greatly at variance with the evidence and contentions of petitioner. No greater effect will be given to evidence which petitioner may introduce in some future proceeding before the Commission in an attempt to overcome the *prima facie* effect accorded by the Act to this valuation order. Therefore, unless and until set aside and annulled, this valuation will stand as a continuing menace against petitioner, and may be repeatedly used to petitioner's prejudice in rate, division, consolidation, security-issue and recapture proceedings." Brief for Appellee, pp. 64–65.

The Court specifically referred to this argument of counsel: "One [argument in support of jurisdiction] is that since the Commission has by reason of errors of law and of judgment grossly undervalued the property, its report will, unless suppressed, injure the credit of the carrier with the public." Finding, however, that the order did not finally determine any legal rights, the Court refused review: "Its [the Commission's] conclusions, if erroneous in law, may

be disregarded. But neither its utterances, nor its processes of reasoning, as distinguished from its acts, are a subject for injunction." 273 U. S. at 314–15.[1]

To argue that irreparable injury implies reviewability is, in effect, to contend that there must be a remedy because the plaintiff claims serious damage. But in these situations—in reviewing "orders" under the Urgent Deficiencies Act—federal courts can give a remedy only to enforce a legal right, and a legal right cannot be derived merely by concluding that a particular claim of hardship should afford a remedy. While formally we may appear to be dealing with technicalities, behind these considerations lie deep issues of policy in the division of authority as between administrative agencies and courts in carrying out the constitutional will of Congress. The source of the misconception underlying the claim for equitable relief in this case is the assumption that this is merely an ordinary invocation of equity, as though it were a controversy between two litigants of which only the courts are or can be seized. What we are here concerned with is due regard for the proper distribution made by Congress of legal authority as between two law-enforcing agencies of government, the administrative and the judicial. See *United States* v. *Morgan*, 307 U. S. 183, 190–91; *Federal Communications Comm'n* v. *Pottsville Broadcasting Co.*, 309 U. S. 134.

---

[1] To the same effect is *United States* v. *Illinois Central R. Co.*, 244 U. S. 82. There the Interstate Commerce Commission issued an order fixing the time and place for hearing complaints made by various coal companies seeking damages against railroads for failing to supply a sufficient number of coal cars for their shipping needs. The railroads brought suit under the Urgent Deficiencies Act to annul this order, alleging that unless the hearing were restrained, the railroads would be put to enormous expense and inconvenience. The Court held that the notice of hearing "had no characteristic of an order, affirmative or negative," and since it "was a mere incident in the proceeding," the suit could not be entertained. 244 U. S. at 89.

This case illustrates anew the influence of a particular instance of felt hardship in derailing legal principles from customary tracks. But this is not an isolated case. If threatened damage through general pronouncement of policy for future administrative action, even if cast in the formal language of a regulation, is to give rise to equitable review apart from the rule that judicial review is premature because of want of administrative finality, the same basis of irreparable harm which is here equated to jurisdiction will bear rich litigious fruit in the case of "regulations" issued by the Securities and Exchange Commission which are damaging in their immediate repercussions to stock exchange and holding companies, or regulations announced by the Treasury for the guidance of taxpayers but which adversely affect business interests, or regulations by the Federal Power Commission, etc. Suppose, for example, that the Commissioner of Internal Revenue issues a ruling that profits derived by radio stations from their network operations are subject to a tax deemed by them onerous and illegal. Could a network successfully bring a suit in equity prior to the imposition of such taxes to invalidate the ruling on the ground that its practical consequence was the cancellation of or refusal to renew network affiliations? One had supposed that the answer was clearly no. But surely in principle the problem is essentially that of the cases before us.

A final consideration remains. We are not dealing with the reviewability of administrative orders *in vacuo*. The reviewability of an order of the Federal Communications Commission depends upon the statutory scheme of judicial review embodied in § 402 of the Communications Act of 1934. Therefore, even if the regulations could be deemed to possess the essential attributes of a reviewable order, it would not inevitably follow that the order is reviewable in the manner provided for by § 402 (a) of the Act. The scope and historical background of the provisions for judi-

cial review contained in the Communications Act of 1934 have too recently been canvassed, see *Scripps-Howard Radio* v. *Federal Communications Comm'n, ante,* p. 4; *Federal Communications Comm'n* v. *Columbia Broadcasting System,* 311 U. S. 132; *Federal Communications Comm'n* v. *Pottsville Broadcasting Co.,* 309 U. S. 134, to require detailed consideration here. Briefly, the Act created two avenues by which orders of the Federal Communications Commission were open to review by the federal courts. Under § 402 (a), incorporating the provisions of the Urgent Deficiencies Act of October 22, 1913, 38 Stat. 208, 219, relating to judicial review of orders of the Interstate Commerce Commission, a suit to enforce, set aside, annul, or suspend an order of the Federal Communications Commission may be brought in a specially constituted district court, with a right of direct appeal to this Court, only if the order does not fall within the exceptions enumerated by § 402 (b), namely, orders granting or denying applications for station licenses or construction permits and for renewal or modification of licenses. Review of the orders comprehended within § 402 (b) is available only through an appeal to the Court of Appeals for the District of Columbia, with no right of direct appeal to this Court.

If the regulations do constitute an order, what kind of an order can it be? It must be in the nature of a blanket denial, operating *in futuro,* to be sure, of applications for renewal of station licenses. But the Act expressly precludes judicial review of orders denying renewal applications of licensees in any manner other than that prescribed by § 402 (b), to wit, by an appeal to the Court of Appeals for the District of Columbia. As the court below held, the effect of taking jurisdiction in these cases is to substitute a different court and a different procedure for those specified by Congress. This Court has not in the past displayed such an indifference to the particularities

of legislation defining the jurisdiction of the lower federal courts. On the contrary, only last Term did the Court insist upon strict compliance with the statutory scheme for judicial review established by the Communications Act of 1934. See *Federal Communications Comm'n* v. *Columbia Broadcasting System*, 311 U. S. 132.

Even if we were free to disregard the scheme for judicial review which Congress has established, I could not agree that an appeal under § 402 (b) would not be an adequate means for testing the claims made in the present litigation. There is essentially only one issue on the merits in this proceeding, namely, whether the adoption by the Commission of the policies expressed in the regulations transgresses its statutory and constitutional authority. But this issue could be raised and fully determined in an appeal under § 402 (b) from an order denying a renewal application. Indeed, in its Minute of October 31, 1941, the Commission explicitly stated that the validity of the regulations could be put in issue in a renewal proceeding. If anything, therefore, the issues in an appeal under § 402 (b) would be broader and not narrower than the issues here. Moreover, since the reasonableness of the application of the regulations to the particular situation would also be in issue in the renewal proceeding, the reviewing court would have before it a record containing elements of concreteness and particularity not present in the record now before us.

The Commission's Minute enables a licensee to contest the validity of the regulations, or the reasonableness of applying them to the particular case, without fear of losing its license. "In order to insure that the station may remain on the air and be in no way injured by any such Commission proceeding [contesting the validity of the regulations] and appeal to court from a decision in such proceeding, the Commission will grant such licensee a

temporary extension of its license, with renewals from time to time until there has been a final determination of the issues raised at such hearing. In the event of such litigation, and if the validity of the application of the Chain Broadcasting Regulations to such licensee is sustained by the courts, the Commission will nevertheless grant a regular license to the licensee, otherwise entitled thereto, who has unsuccessfully litigated that issue, if the licensee thereupon conforms to the decision."

Plainly, therefore, a licensee is under no compulsion to cancel or modify its affiliation contract. Licensees who regard the regulations as invalid are free to continue their existing contracts and at the same time challenge the regulations in the orderly manner provided by the Act—and without any danger of losing their right to continue broadcasting. Similarly, the interests of the networks may be protected through intervention in renewal proceedings. Under the Commission's procedure, Rule 1.102 of the Rules of Practice and Procedure, where a renewal application is designated for hearing because of the licensee's contractual arrangements with others, the latter are customarily permitted to intervene. See, for example, Application of E. J. Regan and F. Arthur Bostwick, Docket No. 5788; Application of John H. Stenger, Jr., Docket No. 5430.

We need go no farther than this litigation to perceive the unfortunate effects of premature judicial review. The chain broadcasting regulations were issued on May 2, 1941, more than a year ago. They were adopted by the Commission as a consequence of its finding, after an investigation lasting more than three years, that certain features of network-affiliation contracts prevented licensees from effectively discharging their obligation to render the fullest service to the listening public. The policy formulated by the Commission may or may not be wise—that is not our concern. But we cannot blink the fact that this litigation has for more than a year pre-

vented the Commission from testing by experience the practical wisdom of a policy found by it to be required by the public interest. The commencement of a proceeding under § 402 (b) would not have presented the jurisdictional problems present in this proceeding. Surely those desirous of a speedy adjudication of the issue of the validity of the regulations were aware that the commencement of a proceeding under § 402 (a) would not produce a prompt adjudication on the merits, but that it would instead result in postponing for a considerable period the effective date of the regulations, with all the contingent advantages afforded by such postponement.

Hardship there may well come through action of an administrative agency. But to slide from recognition of a hardship to assertion of jurisdiction is once more to assume that only the courts are the guardians of the rights and liberties of the people. In denying that it had power to review the action of the Federal Communications Commission because that body had not yet determined a legal right, the court below, as Judge Learned Hand's opinion abundantly proves, was not respecting a rule of etiquette. On the contrary, it merely recognized that the federal courts are entrusted with the correction of administrative errors or wrong-doing only to the extent of Congressional authorization. To say that the courts should reject the doctrine of administrative finality and take jurisdiction whenever action of an administrative agency may seriously affect substantial business interests, regardless of how intermediate or incomplete the action may be, is, in effect, to imply that the protection of legal interests is entrusted solely to the courts. The unbroken current of this Court's decisions in construing the scope of judicial review under the Urgent Deficiencies Act, and which is the only warrant for jurisdiction in this case, repels such a contention. The decision should therefore be affirmed.

MR. JUSTICE REED and MR. JUSTICE DOUGLAS join in this dissent.