In the Matter of PERSONAL FINANCE COMPANY OF NEW YORK et al., Petitioners, against WILLIAM A. LYON, as Superintendent of Banks of the State of New York, et al., Respondents.

Supreme Court, Special Term, New York County, April 16, 1953.

*Wilkie Bushby, Fred N. Fishman* and *Robert S. Groban* for petitioners.

*Nathaniel L. Goldstein, Attorney-General (Samuel A. Hirshowitz* of counsel), for William A. Lyon, as Superintendent of Banks, respondent.

*George L. Hinman* and *A. Lawrence Abrams* for Friendly Finance Service, Incorporated, respondent.

BOTEIN, J. This article 78 proceeding is brought by seven licensed small loan companies conducting business in this State. The respondent Superintendent of Banks of the State of New York ("Superintendent") granted licenses to the respondent Friendly Finance Service, Incorporated, ("Friendly") to operate small loan offices in Syracuse and Utica. Petitioners seek to annul this action by the "Superintendent".

The controversy was sparked by the statement in a weekly bulletin issued by the Banking Department that the aforementioned licenses were issued to "Friendly" "in reliance on a stipulation of the licensee that if it charges a rate of interest

in excess of two per centum per month on any part of the unpaid principal balance up to Three Hundred Dollars ($300.00) of any loan, these licenses will be immediately and voluntarily surrendered by the licensee, and that in the absence of such surrender, the Superintendent of Banks may forthwith cancel and revoke the same without notice to the licensee ".

Petitioners maintain that the licenses in dispute are invalid because the "Superintendent" is not authorized to issue a license in reliance upon an agreement or stipulation by the prospective licensee as to the maximum rates of interest it might charge. In support of this contention petitioners cite section 352 of the Banking Law, which fixes the maximum rates chargeable by licensed lenders for loans up to $500 at 2½% per month for the first $100, 2% for the next $200, and ½% for the next $200 — rates in excess of those recited in the stipulation between the respondents. Petitioners also assert that the stipulation voids the license because "it prescribes an illegal procedure for revocation of the license"; and they cite in contrast the procedure requiring notice and hearing for revocation of a license as specified in section 348 of the Banking Law. "Friendly" itself does not complain of the stipulation upon which the "Superintendent" allegedly relied, but instead "Friendly" joins the latter in opposing this application to revoke its licenses.

The answers of the respondents, underlined by their briefs, challenge any impression that the "Superintendent" imposed conditions upon "Friendly" governing the rates to be charged and the method of revocation of the license. "Friendly" in making application, volunteered to continue in the cities of Syracuse and Utica the practice of charging less than the maximum rates which it had followed for years in Binghamton. The "Superintendent" adopted the volunteered representation; and while there is no doubt that it was a consideration which, in part at least, moved him to grant "Friendly's" application, the representation was not incorporated into the licenses. In his sworn answer the "Superintendent" pledges that he "does not intend to and will not require any of the petitioners or other licensed lenders to offer any stipulation with respect to revocation of licenses," and that "he does not intend and will not at any time cancel and revoke any of the licenses issued to 'Friendly' involved in this proceeding without notice and hearing as provided for by statute".

The threshold question raised by these issues is whether petitioners have standing to bring this proceeding.

Petitioners complain of the circumstances surrounding the issuance of licenses to " Friendly ". However, petitioners have not thereby been ordered to do or to refrain from doing anything; nothing has been taken from them; and it does not otherwise appear that any injury, imminent or remote, has been or will be suffered by them. Of course, standing to sue is not buttressed by such fortuitous circumstances as whether the wrongful injury complained of is occasioned indirectly rather than directly, or by general rule or regulation rather than in the form of an order aimed precisely at the complainant. It is enough that either actual or threatened injury to a legally protected right is shown (*Anti-Fascist Committee* v. *McGrath,* 341 U. S. 123; *Columbia System* v. *United States,* 316 U. S. 407; *Acorn Employment Service* v. *Moss,* 292 N. Y. 147). But injury there must be unless the suit is of the special " taxpayer " genre, and here there is neither injury nor, as will be discussed, special " taxpayer " status.

This is not a case in which the grant of licenses to " Friendly " was alleged to be exclusive or to have caused the denial of a license to any of the petitioners or any other applicant. The application of one petitioner for a license to operate in Syracuse was denied after the licenses to " Friendly " were granted and the appertaining " stipulation " announced; but admittedly the time to complain on this score has expired. Nor is it claimed that " Friendly's " status as a competitor causes or will cause petitioners injury. For even if injury caused by competition were sufficient to confer standing (cf. *Bee Line* v. *La Guardia,* 244 App. Div. 151, with *Mt. Hope Development Corp.* v. *James,* 233 App. Div. 284, and *Matter of Dairymen's League Co-op. Assn.* v. *Du Mond,* 201 Misc. 354), the complaint here is not that the " Superintendent " has improperly licensed a competitor which by its competition has caused petitioners injury. Petitioners complain instead that the " Superintendent " has " injured " them by the precedent that they apprehend will be carved out of the circumstances governing the grant of the licenses to " Friendly ". Thus, the premise for standing reduces itself to the potential danger to petitioners inherent in the allegedly illegal assertion of power by the " Superintendent ".

However, the " Superintendent " expressly and convincingly disclaims the power to fix rates or to condition the issuance or revocation of a license upon interest rates charged or to be charged. He asserts only that he has considered, and intends in the future to consider, *inter alia,* past and prospective rates in determining whether to grant a license to an applicant. The

record bears out the " Superintendent's " contention that an applicant's representation as to rates will be weighed " with other factors as a part of the aggregate material upon which a decision is based ". In his answer the " Superintendent " alleges that " the stipulation complained of by the petitioners is not intended to and does not have the effect of a general notice by respondent that other applications must be accompanied by the stipulation offered by Friendly ". And petitioners point to no instance in which a license was refused or revoked for failure to accede to any condition positing rates below the statutory maximum interest rates. To the contrary, licenses have been issued to applicants, subsequent to the granting of the " Friendly " licenses in Syracuse and Utica, without any representation by the applicants of their intentions with respect to rates.

This course of conduct is a far cry from the type of mandate by regulation which may be reviewed judicially even when not directly and immediately applied to the complainant (cf. *Columbia System* v. *United States, supra*). Conceivably, the " Superintendent's " consideration of an applicant's representations as to past or future rates may never result in the issuance or denial of a license which would not otherwise have been issued or denied. In short, petitioners do not show injury to a legally protected right merely by reference to a flexible, nondecisive criterion which is one of many involved in an administrative determination not itself alleged to be injurious. It will be more appropriate for petitioners to claim standing when it can be demonstrated that the tenuous fears they now entertain have ripened palpably into a threatened, if not actual, injury.

No injury sufficient to base standing having been claimed, petitioners seek alternatively to construct standing on the ground, apart from injury, that as " taxpayers " and " citizens " they may sue for the alleged unlawful acts of the " Superintendent ".

It is clear, however, that the allegations in this proceeding will not sustain a taxpayer suit. There is no specific statutory authorization for a taxpayer's action based upon improper issuance of a license by the " Superintendent " (cf. Civil Service Law, § 28). And as the action is against a State rather than a municipal officer, the general statutory basis found in section 51 of the General Municipal Law, is unavailable to petitioners, even if otherwise appropriate herein. (*Albany County* v. *Hooker*, 204 N. Y. 1; *Schieffelin* v. *Komfort*, 212 N. Y. 520; *Bull* v. *Stichman*, 273 App. Div. 311, affd. 298 N. Y. 516.)

Petitioners' position as "citizens" is no stronger than the one they occupy as "taxpayers". Persuasive authority will be found in *Matter of J. D. L. Corp.* v. *Bruckman* (171 Misc. 3), for the proposition that corporations — and petitioners are such — are not "citizens" within the scope of that term for purposes of defining those who may sue on behalf of the general weal. Moreover, not every citizen may play the role of private prosecutor whenever he believes some officer has exceeded or failed to perform his proper executive functions. Some of the appropriate areas for a "citizen's" action were recently surveyed by the Appellate Division, First Department, in *Matter of United Press Assns.* v. *Valente* (281 App. Div. 395, 400) : "Members of the public have, it is true, a right to apply to the courts to compel observance of the election laws (*Matter of McCabe* v. *Voorhis*, 243 N. Y. 401; *People ex rel. Daley* v. *Rice*, 129 N. Y. 449), and to require observance of the civil service laws in the selection of public officers or employees (*Matter of Cash* v. *Bates*, 301 N. Y. 258; *Matter of Andresen* v. *Rice*, 277 N. Y. 271)." Similarly, such an action will lie to secure the abatement of a nuisance in the public streets (*People ex rel. Pumpyansky* v. *Keating*, 168 N. Y. 390; *Huff* v. *City of New York*, 202 App. Div. 425; see, also, *Southern Leasing Co.* v. *Ludwig*, 217 N. Y. 100). The integrating rationale of these lines of cases is that the "citizen" is "seeking to enforce a right in which the general public is interested" (*People ex rel. Pumpyansky* v. *Keating, supra*, p. 393).

Of course, it does not follow, as petitioners seem to say, that in any matter affected with the public interest, citizen may sue official for dereliction. This embraces too much. Every regulatory agency is ultimately concerned to some degree with the public interest. It cannot be seriously argued, therefore, that every officer of government is answerable in suit to every citizen. The line may be drawn where the subject matter of the officer's administration, such as the election process, the civil service, the public streets, extends to the entire public, not to some special sector thereof; and to each citizen in his capacity as a member of the general public, not as a private person. Small loan legislation and regulation, important and influential though they may be, do not touch the citizen as a member of the general public. The citizen is affected by such official State action, not as the owner of an undivided and indivisible interest in some public activity or property, but as a private party. True his private action in this respect has some public overtones; but

it nonetheless is not that special activity of a citizen, *qua* citizen, which alone can sustain a " citizen's " action.

It appears to me, therefore, that petitioners lack standing. But even if they were to hurdle this preliminary obstacle, they should not prevail upon the merits in this proceeding.

The " Superintendent " is directed by the Legislature to consider, in passing upon license applications, whether " allowing such applicant to engage in business will promote the convenience and advantage of the community in which the business of the applicant is to be conducted " (Banking Law, § 343). And he is empowered to make " such general rules and regulations, and such specific rulings, demands and findings as may be necessary for the proper conduct of the business authorized and licensed under and for the enforcement of this article " (Banking Law, § 360). The relevant statutes include the previously mentioned provision for maximum rates chargeable by the maker of small loans (Banking Law, § 352) — rates which represent a fine balance upon the legislative scales. One side is weighted by the necessity of maintaining a rate suitable for persons of small means and exigent needs; the other by the realization bred from past experience that there must be a return compatible with the investment and risk involved in this business to induce responsible institutions rather than unscrupulous loan sharks to enter. (Special Report of the Superintendent of Banks on Licensed Lenders [1946].)

Powerful and compelling reasons, entirely consonant with the foregoing statutory pattern and purposes, are cited by the " Superintendent " to sustain his action here. With the exception of " Friendly ", every one of the hundreds of licensed small loan offices in the State, including those of petitioners, are charging identical rates — the statutory maximum. Except for " Friendly", those which previously charged lesser rates were bought up by the others — and their rates were then increased to the prevalent maximum rate.

The evidence is convincing that the conversion, over a period of years, of the statutory maximum rates in this State to the factual minimum did not evolve from the free play of a competitive market. Thus, in 1941, more than half of the licensees operated at less than the statutory maximum rate. The impact of a war economy in the years 1941–1945, fairly and naturally reduced that number greatly. However, during the period running from 1946 through 1950, the number of such licensees dwindled to one — namely " Friendly " — although the prevailing normal competitive situation should have stimulated a

much larger number to charge less than maximum rates. For in those five post-war years the amount of small loans outstanding throughout the State increased 84%; the average size of each loan increased 43%; the average of loans outstanding per office increased 82%; net income after interest increased 105%, and surplus and net worth 106%; collections never dropped below 98.2%, and bad debt charges were insignificant. In a similar period banks operating personal loan departments, under comparable competitive conditions, tended to reduce their rates to figures below the applicable maximum. (See Annual Report of the Superintendent of Banks [1951], p. 36.)

But all through this lush period of easy credit, enormous profits and slight risks, the interest rates to the small borrower did not respond to such favorable factors. The small loan companies operating in this State, with the exception of '' Friendly '', have maintained a rigid scale of statutory maximum rates.

Respondents recall that in 1940 more than half the licensees were operating at less than the statutory maximum rates and that in 1941, partly on this showing, the '' Superintendent '' recommended and the Legislature enacted a reduction in such maximum rates. Respondents suggest that petitioners apprehend that if there is widespread reduction of rates, the Legislature may again lower the statutory maximum.

Viewed against such a background, in which the ceiling above and the floor below rates have merged, the '' Superintendent '' can be pardoned some skepticism as to whether the forces of free competition are being given unhampered play in the small loan industry.

It has been said of an earlier statute reflecting the substance of the present section 352 of the Banking Law: '' It was intended that the maximum rate should at all times be the ceiling, *under* which loans of that particular nature may be made. The statute fixes the ceiling, and then calls upon the principle of supply and demand to determine what rate *under* this ceiling the people will have to pay.'' (Association of the Bar of the City of New York, Committee on State Legislation, Memorandum No. 48 [1940], p. 139.) If so, the action of the '' Superintendent '' here under review is amply within the legislative ambit. He has simply sought to restore the maximum as a ceiling, and to allow room for the free operation of supply and demand.

Petitioners urge at great length that the legislative history demonstrates that the '' Superintendent '' is without power to fix or determine rates. Indeed, and despite the great reaches

of the language of article IX of the Banking Law, the "Superintendent" does not dispute the petitioners' interpretation; and he makes no claim to the power to fix rates either directly or by indirection. He holds that simply because several hundred logs have piled up on the bank of the stream of free competition, he must not add two fresh logs to the log jam but may release them on their way downstream. Far from challenging, he seeks to implement the exclusive power of the Legislature to fix maximum rates, leaving it to "the principle of supply and demand to determine what rate *under* this ceiling the people will have to pay". In this context he claims the right, in connection with the issuance of licenses, to consider — not fix — rates charged and to be charged. The evidence does not show that such consideration on his part has fixed or determined rates, except, perhaps, insofar as it may properly stimulate a free and healthy competitive situation resulting in a lowering of rates; or encourage the licensing of lenders offering to charge less than maximum rates, which may possibly furnish experience data for legislative guidance. This much the "Superintendent" is authorized to do by the broad language as well as by the special policy of the legislation.

The petition is dismissed. Settle order.