**INDEPENDENT BROKER–DEALERS' TRADE ASSOCIATION et al.,**
Appellants,

v.

**SECURITIES & EXCHANGE COMMISSION et al.**

No. 22552.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 23, 1970.

Decided March 4, 1971.

As Amended May 18, 1971.

Robb, Circuit Judge, filed a dissenting opinion.

---

Mr. Carl L. Shipley, Washington, D. C., and Mr. Alan A. Garfinkel, Pittsburgh, Pa., of the bar of the Supreme Court of Pennsylvania, pro hac vice, by special leave of court, for appellants.

Mr. Philip A. Loomis, Jr., General Counsel, Securities & Exchange Commission, with whom Messrs. Walter P. North, Associate General Counsel, and Brian M. Eisenberg, Atty., Securities & Exchange Commission, were on the brief, for appellees.

Before LEVENTHAL, ROBINSON, and ROBB, Circuit Judges.

LEVENTHAL, Circuit Judge:

In October, 1968, the members of the New York Stock Exchange voted to abolish customer-directed give-ups of brokerage fees. Appellants, an unincorporated association of securities brokers and dealers and several of its members, brought this action in the District Court for declaratory and injunctive relief. They claimed that the Securities and Exchange Commission had in effect ordered the Exchange to abolish give-ups, in a letter dated August 30, 1968, and that this order was beyond the scope of the Commission's power and was issued without notice or adequate hearing required by statute. Motions for summary judgment were filed by appellants and by the Commission. On November 21, 1968, the District Court dismissed appellants' complaint for lack of jurisdiction over the subject matter. The District Court stated that the SEC's action had amounted to a "mere suggestion," which neither required notice and hearing, nor was subject to judicial review. This appeal followed.

We hold that the record presents a case of agency action entitling the broker and dealer plaintiffs to limited judicial re-

view, relying on the Commission's letter not as such but as the culmination of activity hereafter discussed in detail. Although the District Court erred in dismissing the complaint for lack of jurisdiction, we do not remand for further proceedings because we conclude on the merits that appellants' claims are insubstantial and that therefore this complaint against the Commission should stand dismissed with prejudice by granting the Commission's motion for summary judgment.

*Background*

When a securities broker surrenders a portion of his commission on a transaction to another broker, the surrendered portion is referred to as a "give-up." [1] The "customer-directed give-up" is generally paid at the direction of institutional investment managers; the recipient broker has generally not been connected with the particular transaction, but is receiving compensation in this way for other services, such as research, performed on behalf of the institution. [2]

The practice of give-ups developed largely as a result of the securities exchange's rigid minimum rate schedule, which did not permit volume discounts on large securities transactions. Thus "the commissions charged on an order for 10,000 shares of a given security * * * will be exactly 100 times the commission for a 100-share order," [3] even though the broker's expenses are not greater by any factor remotely like 100-fold. Because of the profitability to brokers of handling large transactions in the absence of a volume discount, many members of the New York Stock Exchange (NYSE) were willing to give up as much as 70% of the commission on these orders. [4] The practice naturally increased with the huge growth of institutional investment and the consequent rise in large transactions. [5]

Give-ups, among other practices, posed problems of conflict of interest if not outright violation of fiduciary duty by managers of mutual funds. Give-ups also highlighted a serious question of whether a rigid minimum rate structure, such as the NYSE's, could be considered reasonable, if brokers were willing to surrender a large part of their commissions.

The record discloses that the matter of give-ups and the NYSE rate structure were subjects of concern to the Commission long before the Exchange's 1968 action that gave rise to this litigation. On July 18, 1966, the Commission wrote to all national securities exchanges and the National Association of Securities Dealers and expressed its concern over the give-up problem. In its report to the House Commerce Committee, dated December 2, 1966, the Commission reiterated this concern and recommended once

1. Report of the Securities and Exchange Commission to the House Committee on Interstate and Foreign Commerce, Public Policy Implications of Investment Company Growth ("Mutual Fund Study"), H.R.Rep.No.2337, 89th Cong., 2d Sess. 169–170 (1966).

2. These should be distinguished from the sharing of commissions between two brokers who have jointly participated in the transaction.

3. Mutual Fund Study 156–157.

4. *Id.* at 170.

5. "On the New York Stock Exchange institutional volume as a percent of total public volume has increased from 25.4 percent in March 1956 to 33.8 percent in September 1961, to 39.3 percent in March 1965 and 42.9 percent in October 1966. * * * These institutions tend to deal in larger blocks of stock than individual investors ordinarily do. Consequently increasing institutional participation in the exchange markets has been accompanied by a significant increase in the number of large blocks offered and traded. Studies by the New York Stock Exchange show that the number of transactions involving 10,000 shares or more has increased from 2171 in 1965 to 6685 in 1967, that the number of shares involved in those transactions has more than tripled, and that their share of reported volume has increased from 3.1 percent to 6.5 percent." SEC Release No. 8239, January 26, 1968 (App. 5–6).

more that the exchanges abolish give-ups.[6]

The first significant response came on January 2, 1968, in a letter from Robert W. Haack, president of the NYSE, to its members. (App. 24–28). Explaining the need for a change in the minimum rate structure, Mr. Haack declared that the "minimum commission rate is ceasing to be a 'minimum'" because of give-ups and related practices. He recommended, among other things, the incorporation of a volume discount in the rate schedule, but also supported the continuation of customer-directed give-ups, "with a limitation on the percentage amount which may be so given-up." President Haack also stated that the NYSE proposals had been presented to the Commission for consideration.

On January 26, 1968, the Commission issued its Release No. 8239, announcing the submission of proposals by the Exchange. The Commission also announced that it had under consideration a proposal to adopt Rule 10b–10 under the Securities Exchange Act of 1934. The proposed rule was the product of Commission concern over the effect of give-ups on the ability of investment company managers to fulfill their fiduciary obligations. The rule, if adopted, would prohibit give-ups at the direction of these managers "unless the benefits of such division accrue to the investment company and its shareholders." The Commission invited all interested persons to submit their views on the Exchange proposals and the proposed rule.

The comments submitted by the Justice Department on April 1, 1968, set forth that the proposed Rule 10b–10 did not go far enough, and urged the Commission to hold hearings on the advisability of eliminating minimum rates altogether. On May 28, 1968, the Commission issued an Order directing a public hearing and investigation on several subjects, including "give-ups and reciprocal practices among different categories of members and nonmembers."

On the same day, May 28, 1968, Chairman Manuel Cohen of the SEC wrote to President Haack, making "written request pursuant to Section 19(b) of the Securities Exchange Act" that the Exchange amend its rate structure either by following a minimum fee schedule which the Commission had prepared, or by eliminating minimum rates entirely on orders of more than $50,000. (App. 31). Mr. Haack answered this letter on August 8, accepting the first of the SEC's requests, with some revisions in the Commission's proposed schedule. In addition, President Haack went on to propose the abolition of customer-directed give-ups.

The Commission accepted these counter-proposals of the Exchange in its letter of August 30, 1968. The Commission stated that in view "of the considerations set forth in your letters of August 8 and 20 and subject to confirmation of the understanding stated in the preceding paragraph of this letter, we hereby modify the direction to you, pursuant to Section 19(b) of the Exchange Act contained in the Commission's letter of May 28, 1968 to the effect that: alternative (a) of such direction will be satisfied by the adoption of the specific interim non-member commission schedule described in your letters of August 8 and 20, the specific interim intra-member commission schedule also described therein, and the additional language to the Exchange constitution prohibiting customer-directed give-ups. * * * We wish to emphasize that these changes are interim steps." (App. 52–53). The Exchange proposals were then submitted to a vote of the membership and were adopted, effective December 5, 1968.

*Jurisdiction*

Section 19(b) of the Securities Exchange Act of 1934 [7] provides a two-step

---

6. Mutual Fund Study 185–186.

7. 15 U.S.C. § 78s(b) provides in part as follows:

> The Commission is further authorized, if after making appropriate request in writing to a national securities exchange that such exchange effect on its own behalf specified changes in its rules and practices, and after appropriate notice and opportunity for hear-

procedure for the regulation of national securities exchanges. Under this procedure the Commission first makes a Request in writing that the exchange effect on its own behalf specified changes in its rules and practices. If the exchange refuses to comply with the Request, the Commission may proceed to the second step,—*i. e.*, if it determines after notice and opportunity for a hearing that such changes are necessary for protection of investors or to insure fair dealing in securities, the Commission is authorized, by regulation or rule, to alter or supplement the rules of the exchange.

Appellants contend that the Commission's action on give-ups—especially the August 30 letter with its repeated references to "direction"—amounted to an Order under Section 19(b) of the 1934 Act. They further contend that the Commission's failure to hold public hearings on give-ups before issuing this Order was a violation of statutory duty and thus subject to judicial review. The Commission, on the other hand, argues that the Exchange alone abolished give-ups, that the Commission did no more than "request" voluntary action by the Exchange, and that it has neither violated any procedural requirements nor taken "agency action" subject to review under the Administrative Procedure Act.[8]

We agree with appellants that the District Court had jurisdiction to review the validity of the Commission's action in this case. However, we do not conclude, as appellants would argue, that the use of the word "direction" by the Commission in one of its letters establishes that its action is tantamount to a mandate. Rather we look at the events more broadly, and conclude that the Commission was significantly involved in the Exchange's decision to prohibit give-ups, and involved in a way and to an extent that cannot be ignored as devoid of legal materiality. That involvement of a government agency is meaningful enough to call for application of vital principles of judicial review, to consider appellants' claim that the action was not lawfully taken. We sustain jurisdiction in the District Court on the ground that this agency involvement constitutes "agency action" within the meaning of the Administrative Procedure Act, 5 U.S.C. §§ 702, 704 (1964), and alternatively by reference to the court's general equity jurisdiction.

It is true, as the Commission insists, that the Administrative Procedure Act does not provide review for everything done by an administrative agency. *See, e. g.*, Hearst Radio, Inc. v. FCC, 83 U.S. App.D.C. 63, 167 F.2d 225 (1948) (FCC publication of report, "Public Service Responsibility of Broadcast Licensees"). But we do not think immunity from judicial consideration and correction may be claimed for the agency activity before us.

We begin our analysis with a closer examination of some of the events preceding the abolition of give-ups by the Exchange. Especially significant is the

---

ing, the Commission determines that such exchange has not made the changes so requested, and that such changes are necessary or appropriate for the protection of investors or to insure fair dealing in securities traded in upon such exchange or to insure fair administration of such exchange, by rules or regulations or by order to alter or supplement the rules of such exchange (insofar as necessary or appropriate to effect such changes) in respect of such matters as * * * (9) the fixing of reasonable rates of commission, interest, listing, and other charges * * *.

8. The Administrative Procedure Act provides in part as follows:

"A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

\* \* \* \* \*

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action * * *."

5 U.S.C. §§ 702, 704.

fact that the original Exchange proposal of January 2, 1968, called for the continuation of give-ups, although with some percentage limits. And what the Commission's May 28 Request under § 19(b) related to was elimination or at least drastic reduction of the Exchange's minimum rate schedule. Why, then, did President Haack on August 8 propose, and the membership later approve, total abolition of give-ups? The explanation lies in the greater importance attached by the Exchange to retention of a minimum rate structure. The Commission had made clear its abiding concern with give-ups, not only in its 1966 expressions to the industry and the Congress, but in its formal rulemaking proposal, issued January 26, 1968, after Mr. Haack's letter to NYSE members supported continuation of give-ups with modifications. Moreover, the Commission's letter of May 28 stated that its accompanying Request as to minimum rates was only "intended as an interim step," and added (App. 31–32):

"Additional measures with respect to other matters, including give-ups are under continuing consideration and will be examined in the course of the hearing commencing July 1, 1968.

"The request that your exchange take the foregoing steps is made in the context of the Commission's responsibilities to consider the national policies embodied both in the securities laws and in the antitrust laws. It is based upon the deficiencies in the present exchange rate structure which fails to provide appropriate discounts but permits give-ups directed by institutional managers, with consequent departures from the purported minimum rate structure on an arbitrary and discriminatory basis."

The Exchange was fully aware of the inter-relatedness of give-ups and minimum rates. As stated in Mr. Haack's letter of January 2, 1968, the "minimum commission rate is ceasing to be a 'minimum' " because of give-ups and related practices. The August 8 proposal of the Exchange reflected its awareness of the Commission's views, its conclusion that the Commission would in the long run be opposed to continuance of minimum rates as long as give-ups were still in effect, and its judgment that its August 8 counter-proposal was merely a bow to the inevitable that secured acceptability and credence for the dominant interests of the Exchange (on minimum rates) through the technique of making a formal offer to the Commission on give-ups and relieving the Commission of the burden of making a formal demand. This reasoning was rather plainly expressed in the Membership Bulletin of October 10, 1968, where the Board of Governors of the Exchange stated (App. 62–63):

"The Board is strongly of the opinion that the minimum commission can be preserved only if customer directed give-ups are abolished. It is not reasonable to argue for retention of minimum commissions and in the same breath defend the give-up practices that have arisen in recent years, and which have been exhaustively described during the SEC hearings. For this reason, the Exchange made the prohibition of customer-directed give-ups an integral part of the commission rate proposal to the SEC, even though the SEC had not made such a prohibition part of their May 28 request. * * * "

It is important to bear in mind that while the Commission's direct Request of May 28 was limited to the subject of rate structures, the Exchange was on notice of the Commission Staff's well-developed position, following the rate structure hearings in the summer of 1968, that minimum rate schedules could not meaningfully be retained without elimination of give-ups.[9] The Staff concluded that

---

9. The record includes the Commission staff letter to the Exchange of September 4, 1968, signed by Irving Pollack, Director of the Division of Trading and Markets, which refers to "staff views previously conveyed to you informally." The letter continues (App. 54–55):

"You have recognized that as a practical matter, the other exchanges will wish to put into effect changes in order

a proposal to retain minimum rate structure "would be a sham" unless realistically supported by abolition of give-ups, and that while any exchange could contest this position "we believe that the Commission's policy on abolition of give-ups has already been clearly expressed."

It is in this context that we must read the Commission's formal reply dated August 30 accepting the Exchange proposals. The Commission stated that "alternative (a) of such direction will be satisfied by the adoption of the specific interim non-member commission schedule * * *, *and the additional language to the Exchange Constitution prohibiting customer-directed give-ups.*" (App. 53, emphasis added). In context, the Chairman's reference to elimination of give-ups cannot fairly be described as mere acquiescence by the Commission in something that was being initiated by the Exchange but which it did not deem material to the subject of its Request.

The question before us cannot be disposed of by referring to captions or labels. Thus we do not agree with appellants in predicating reviewability on the use of "direction" in the August 30 letter. On the other hand, we cannot agree that a conclusion of nonreviewability is mandated by the fact that the procedure set forth in § 19(b) of the 1934 Act begins with the Commission's presentation of written "Requests," and that it so captioned its letters to the New York Stock Exchange. This word—and the SEC's observation in this court that the New York Stock Exchange's reaction was "voluntary compliance"—fail to recognize, much less account for, the pressures which caused the Exchange to abandon its give-up practices.

■ The fact that an agency has not issued a command does not mean that the step by which it initiated a procedure, or informal activity, leading up to the exercise of its powers may be relegated to the area of mere unreviewable "suggestion." In Medical Committee for Human Rights v. SEC, 139 U.S.App.D.C. 226, 432 F.2d 659 (1970), the Commission has simply refused to compel Dow Chemical to include in its proxy materials certain of petitioners' proposals relating to the manufacture of napalm. Despite protests from the Commission that it had ordered nothing to be done, and therefore had taken no action subject to review, this court sustained jurisdiction and remanded. In Moss v. CAB, 139 U.S. App.D.C. 150, 430 F.2d 891 (1970), the issue was whether the Board's actions amounted to ratemaking such that it was liable to follow certain statutory procedures which it had concededly ignored, or whether the Board had merely refused to suspend rates proposed by the airlines themselves, in which case the procedures would not apply. The Board's major assertion was that it had simply "suggested," not ordered, that the airlines submit a certain rate schedule, and that "as long as the Board only 'suggests' and does not order the future rates, the rates remain carrier-made." 430 F.2d at 898. The court took account of the practicalities rather than the theory or form of the situation, and found that the Board had in effect made new rates without following the prescribed route of decision.

Likewise here it cannot be said to appellants that the Commission had not yet taken effective action. On the contrary, its action was all too effective. The elimination of give-ups which confront appellants with pecuniary harm was ac-

---

to be competitive with your new schedule. In that connection, we have advised you that in the light of the evidence developed at the rate structure hearings, we would urge that any purported change in rate structure, other than the adoption of a provision for freely negotiated rates would be a sham, unless there were evidence that it was

to be realistically adhered to by inclusion of appropriate provisions for abolition of customer-directed give-ups. While any exchange would, of course, be free to argue to the contrary, we believe that the Commission's policy on abolition of give-ups has already been clearly expressed."

complished, not merely threatened. There was no means within the administrative framework by which appellants could force the Commission to hold further hearings on give-ups. As to them the Commission's action was effective and final. That resulting economic harm to appellants means that they are aggrieved,[10] and appellants have no remedy through further administrative action for undoing the harm that has been done.[11]

It is these practicalities that establish the jurisdiction of the District Court. In considering the need for or propriety of judicial review in a particular case, we must recognize that terms like "order" or "request" may be terms of conclusion rather than analysis. "Whether or not the statutory requirements of finality are satisfied in any given case depend not upon the label affixed to its action by the administrative agency but rather upon a realistic appraisal of the

10. The Government adverts (Br. 15) to the fact that appellants are not members of the NYSE and thus are not subject to its rules · regarding give-ups. However, appellants' contention of harm was not based on their inability to execute give-ups in the future, but on the reduction of income resulting from the disability of other brokers (NYSE members) prohibited from giving up commissions. The Government does not deny this, but rather puts it (Br. 23) that mere reduction of plaintiffs' income does not violate their legal rights. The exact harm to plaintiffs is not entirely clear, but there are indications in the record (including affidavits) that give-ups account for a particularly significant amount of the income of small and medium-sized broker-dealers, particularly brokers who are members of regional exchanges or no exchanges ; that by virtue of complex practices non-members do get the benefit of give-ups directed by institutional investors ; that the impact of elimination of give-ups will be heavy on non-member firms, firms engaged in retail sale of mutual funds and also on regional member firms (particularly when conjoined with establishment of volume discounts). The District Court's judgment cannot fairly be sustained on the basis of lack of standing of plaintiffs, in view of the substantial indications of aggrievement in fact and lack of any findings on this matter.

11. Although it has been suggested that appellants seek relief directly from the Exchange in the form of an anti-trust action, there is substantial reason to believe that the Exchange would be immune from such suit. *See* Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963) ; Kaplan v. Lehman Bros., 371 F.2d 409 (7th Cir.), cert. denied, 389 U.S. 954, 88 S.Ct. 820, 19 L.Ed. 2d 365 (1967). Appellants should not be made to sacrifice a remedy against the Commission based on the invalidity of its

action, for the sake of pursuing a remedy against the Exchange which in fact may prove to be non-existent.

The word "immune" in the foregoing paragraph is intended in a practical rather than precise legal significance. It may be that in a particular action the Exchange would be required to answer and even go to trial, and that its defense would be sustained not in terms of an outright (though implied) repeal of the anti-trust laws, but of a ruling that the use of the restraint by the regulatory mechanism provided by the Act (partly self-regulation, partly regulation by the SEC) provides justification under the flexible reasonableness conceptions of antitrust law. See 373 U.S. at 360–61.

Our opinion does not undertake to pass on the antitrust issue. It is conceivable that an antitrust action could be grounded on the consideration that in a particular case, notwithstanding a formal request for a rule change by the SEC, the Exchange and its members had a choice and exercised discretion that were tainted by anti-competitive purpose and impact which could not be justified by the regulatory approach. Nevertheless, the scheme of this Act obviously dilutes the prospects of success for an action based on ordinary antitrust principles of responsibility of the Exchange and its members to avoid competitive restraints,—a dilution at least for the case where the restraint is not in the day-to-day enforcement of a rule by the Exchange (as in Silver), but in the very issuance of a rule whose text would be subject to scrutiny by the SEC. Hence we conclude that the limits we develop in case of a rule change ascribable in significant measure to SEC impropriety cannot be gainsaid on the ground that this prospect, of an antitrust action based on impropriety of the Exchange and its members, is itself sufficient to assure an overall judicial surveillance that is meaningful and adequate.

consequences of such action." Isbrandt-sen Co. v. United States, 93 U.S.App. D.C. 293, 297, 211 F.2d 51, 55, cert. denied, Japan Atlantic and Gulf Conference v. United States, 347 U.S. 990, 74 S.Ct. 852, 98 L.Ed. 1124 (1954). If linguistic technicalities are honored, and the practicalities of administrative involvement ignored, we will have in truth unleashed a "monster which rules with no practical limits on its discretion." [12] This was the danger alluded to in *Moss, supra,* and it underscores why the validity and propriety of the Commission's Request and communications with the Exchange should be subjected to judicial examination.

Had the Exchange refused to follow the Commission's policies with regard to give-ups, and instead brought immediate court action to test their validity, its action would likely have been premature. Since the Act specified procedures, including a full hearing, before the Commission could mandate the effectiveness of these policies over the objection of the Exchange, we would likely have required exhaustion of these administrative proceedings before exercising judicial authority.

That is not the case before us, however. Here the Exchange did not resist; it submitted to what it considered positions of the Commission that constituted a threat to the Exchange's policy of minimum rates, and in doing so cut off a source of income to appellant broker-dealers. *See* Columbia Broadcasting System, Inc. v. United States, 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942). The vitality of the *CBS* doctrine, in finding finality and reviewability of agency actions not issued as regulations or orders but having the consequence and contemplation of "expected conformity," is unmistakable. The pertinent Supreme Court decisions, covering a wide array of policy pronouncements, include, in addition to *CBS*, Frozen Food Express v. United States, 351 U.S. 40, 76 S.Ct. 569, 100 L.Ed. 910 (1956); United States v. Storer Broadcasting Co., 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081 (1956); [13] Abbott Laboratories v. Gardner, 387 U.S. 136, 149ff, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); [14] see also Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). This court's recent decisions carry forward the thrust of these rulings.

Significant in this case are factors that parallel features that were significant in establishing jurisdiction in our recent precedents. Here, as in *Medical Committee*, there was finality as to the impact of the Commission's position on complainant, plus an absence of any ongoing administrative proceeding, and absence of any claim that court jurisdiction would or might interfere with such proceedings. Here, as in *Moss*, there is recognition that if the form of agency policy formation succeeds in concealing or recasting the agency's involvement in a structure of a purely private proposal, there would be an effective preclusion of judicial review. The case of Fay v. Miller,[15] cited by the Government, when

12. Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 167, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962); Greater Boston TV Corp. v. FCC, 143 U.S.App. D.C. ——, 444 F.2d 841 (November 13, 1970).

13. The Court said of Commission statement of policy that it would not grant a license to an applicant already owning five: "The process of rulemaking was complete. It was final agency action." 351 U.S. at 198, 76 S.Ct. at 768.

14. The Court noted that requisite finality is determined "in a pragmatic way." 387 U.S. at 149, 87 S.Ct. 1507.

15. In Fay v. Miller, 87 U.S.App.D.C. 168, 183 F.2d 986 (1950), this court set aside an injunction issued by the District Court which prohibited, among other things, a United States Attorney from requesting the local telephone company to disconnect plaintiff's telephone service. It does not seem to us that a conclusion of reviewability as to an action by the SEC, which is broadly subject to direct review by courts for abuse of discretion, can be realistically compared with that of a prosecuting attorney, who has broad

properly analyzed, provides support for our conclusion rather than contrary precedent.

We do not rest jurisdiction on the fact that the Exchange's response to the Commission's pressures was involuntary. For all we know, the Exchange might have taken the same action in the absence of any urging by the Commission. What we are saying is that the use of these pressures by the Commission amounts to more than a mere invitation to voluntary compliance, and carries with it both an element of undue influence and sufficient dangers of intrusion into matters beyond the scope of the Commission's power as to require some judicial review of their propriety.

Moreover, the steps taken by the Commission satisfy the statutory definition of reviewable action. 5 U.S.C. § 704 says, "final agency action for which there is no other adequate remedy in a court [is] subject to judicial review." The term "agency action" is defined in § 551(13) to include "rule," and "rule" under § 551(4) includes "an agency statement of general or particular applicability and future effect designed to implement * * * or prescribe law or policy."

■ These concepts are broad enough to cover the present case. The statute does not allow review of every abstract statement of policy. *See* Attorney General's Manual on the Administrative Procedure Act 101–103 (1947). However, where the statement of policy was intended to result in and does result in action on the part of companies that are regulated or subject to regulation, and this terminates or modifies outstanding business relationships with complainants, who have no further administrative recourse or other adequate remedy in court, there is "agency action" that is subject to at least limited judicial review on the issue whether the agency was acting *ultra vires* when it injected itself into the situation.[16]

■ A footnote in the Commission's brief expresses the thought that if the Commission's correspondence constitutes a reviewable "order" then the review provisions of § 25(a) of the Securities Exchange Act, 15 U.S.C. § 78y (1964), give exclusive jurisdiction to the courts of appeals, not the district courts. *Compare* SEC v. Andrews, 88 F.2d 441 (2d Cir. 1937) *with* R. A. Holman & Co. v. SEC, 112 U.S.App.D.C. 43, 299 F.2d 127, cert. denied, 370 U.S. 911, 82 S.Ct. 1257, 8 L.Ed.2d 404 (1962). This issue would relate not to whether there is judicial review, but whether Congress intended to concentrate it as set forth in § 25 of the SEC Act. We discern no such intent, and conclude that to the extent the SEC's actions in regard to Requests are reviewable they are reviewable in the District Court, either by an equity

discretion—whether to seek an indictment, or its dismissal, etc.—not subject to direct judicial review. Also the court in Fay v. Miller stated that no harm had yet occurred (there had been no acquiescence in the request) and that when it was imminent the plaintiff could obtain complete relief against the telephone company. These are all sound grounds of distinction.

Indeed *Fay* provides affirmative support for our conclusion, in view of the court's ruling that the prosecutor would have been a "proper" party, even though he only made a request. It dismissed the suit on grounds of sovereign immunity since there was no allegation that the prosecutor's action was in violation of either the Constitution or his statutory duty. Here there is an allegation that the

Commission's actions violated statutory duty, and we think that charge is reviewable at least where, as here, (1) there has been "acquiescence" so that there will be no review of the Commission's actions in another proceeding, (2) there is present harm to plaintiffs and (3) there is no other available action for vindication of plaintiffs' statutory right to be free of *ultra vires* action by the Commission.

16. This is, of course, subject to an exception when the subject matter is one where the agency's actions are in the domain of nonreviewable discretion under § 701(a) (2). This contention could hardly be made in the matter before us, or the area would become one in which the regulations when issued would be nonreviewable.

action under the doctrine of Columbia Broadcasting System, Inc. v. United States [17] or by an action under the APA (5 U.S.C. § 704) which in our view is probably coterminous with equity doctrine.[18]

■ Section 25(a) applies in terms only to "orders," a narrower concept than that of "agency action" reviewable in district courts, and is available only to persons who were "parties" to actual agency "proceedings." It was intended to provide direct review in cases wherein a clear, formal record of an administrative hearing would be before the reviewing court without the need for presentation to a court of evidence (or affidavit) of the agency's action. While the concept of an order subject to direct review is not frozen, and may be extended if necessary to preserve some element of judicial supervision, it is not fairly available to preclude familiar district court review in the case at bar.

If the court in the exercise of its jurisdiction were to determine on the merits that the Commission acted *ultra vires*, its order, whether for injunctive or declaratory relief, could only be addressed to the Commission as the party before it. But such an order would permit the Exchange to reevaluate its position without the influence of the Commission's pressure or its intervention. If the Exchange would have taken the same action without Commission pressure, it would be free to maintain the status quo, subject only to such action as might be maintained against the Exchange on the ground that its voluntary action infringed the legal rights of others, an issue not before us. The possibility that the Exchange might have taken the same action on its own provides no basis for declining jurisdiction over pressures by the Commission that may wrongfully influence and intrude on its decision-making.

Accordingly, we sustain the jurisdiction of the District Court to hear appellant's substantive and procedural complaints.

*Merits*

Although we conclude the district court erred in disclaiming jurisdiction we see no need for remand for we conclude on the record before us, established on the cross-motions for summary judgment, that although appellants are entitled to judicial consideration of their claims, they should be dismissed on the merits.

Appellants challenge the validity of the Commission's action on four grounds —(1) the Commission has no statutory power "to alter the compensation distributing structure as distinguished from its brokerage commission oversight authority;" (2) the Commission is estopped from ordering the abolition of give-ups by 28 years of tacit consent to the practice; (3) the Commission failed to comply with the procedural requirements of Section 19(b) before ordering the abolition of give-ups; and (4) the abolition of give-ups will cause loss to investors and chaos in the markets.

■ We regard the first two grounds as patently frivolous. The Commission has a general jurisdiction to fix "reasonable rates of commission" under Section 19(b) (9). We have no doubt that, assuming the underlying facts warrant exercise of that power, the Commission has the power under its charter to alter or abolish a minimum rate schedule; or to determine that it would be unreasonable to maintain a minimum rate structure together with give-ups.

Appellants' procedural claim deserves fuller treatment but we conclude that it, too, is without merit. Appellants devel-

---

17. 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942).

18. If the Act should be given narrow reading, the action is sustainable by reference to the general equity jurisdiction of the District Court. Leedom v. Kyne, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958); Peoples v. United States Department of Agriculture, 138 U.S.App.D.C. 291, 427 F.2d 561 (1970).

oped a business opportunity out of a practice of the Exchange. They took the risk, so far as procedure was concerned, that the Exchange might change that policy without either consulting them or following any procedure that gave them voice. They also were subject to the risk that the government agency (here SEC) might adopt a policy which would lead the Exchange to change its policy. Section 19(b) contemplates that the Commission may make Requests without following the formal procedures required in the case of Orders. The Administrative Procedure Act, it may be noted, does not interpose the similar procedures required for rulemaking, including notice and opportunity for hearing, for the kind of rule (and agency action) that is one of the agency's "general statements of policy." See 5 U.S.C. § 553 (1964).

■ We have held that the pressures exerted by the Commission with regard to give-ups constituted agency action that was sufficient to invoke judicial review despite the use of the caption "Request." However, to hold that such action, falling short of an Order, requires absolute adherence to the procedures set forth in § 19(b) for a mandatory order, would be to eliminate the mechanism of informal agency action, and response thereto, that is fairly contemplated by § 19(b) itself. There is room in responsible government to achieve results in the public interest through requests of industry, without the use of mandate or the procedures of mandate, just as there is room to proceed by informal advisory rulings,[19] or by surveillance of regulated companies without formal investigation, or by formal negotiation and settlement.[20]

This kind of request action was not subject to a general requirement of notice and opportunity for hearing. We now consider whether in certain particular matters it was incumbent on the Commission to provide such notice as a matter of elementary fairness even though that was not a universal requirement. American Airlines, Inc. v. CAB, 123 U.S.App.D.C. 310, 359 F.2d 624 (en banc), cert. denied, 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966). Elementary fairness may well require that reasonable opportunity be given for submission of views by those materially affected as a condition of maintaining a government policy that stimulates private action,— at least where, as here, the action proposed for the Exchange lays a burden on persons, like plaintiffs, who are not members of the Exchange and are entitled to no voice before the Exchange.[21]

Whatever might be required in another situation, the record establishes that in the matter before us there had been ample opportunity for submission of such views. On January 26, 1968, the SEC issued its Release No. 8239, inviting comment on a proposal to adopt Rule 10b–10 under the Securities Exchange Act of 1934. The Rule would have prohibited investment company managers from directing give-ups that did not accrue to the investment company. Comments were invited also on a NYSE proposal as to give-ups. In the press release the SEC discussed various aspects of the problems of give-ups and reciprocal business. It noted that the SEC in its 1966 Mutual Fund Report[22] had advised the exchanges of its belief that exchange rules should be changed to preclude customer-directed give-ups.

19. Commission on Organization of the Executive Branch of the Government, Task Force Report on Legal Services and Procedures 189 (1955).

20. City of Chicago v. Federal Power Commission, 128 U.S.App.D.C. 107, 385 F.2d 629 (1967), cert. denied, Public Service Comm. of Wis. v. Federal Power Comm., 390 U.S. 945, 88 S.Ct. 1028, 19 L.Ed.2d 1133 (1968).

21. Compare United States v. Carolene Products Co., 304 U.S. 144, 152, note 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938).
   The reservation of a right to bring a subsequent antitrust action against the Exchange, after the damage is done, cf. Silver, supra, is not a comparable opportunity.

22. Mutual Fund Study 185–186.

While this Notice of Rule-Making focused on certain specific proposals concerning give-ups that are not involved before us, it seems plain that the request for comments by interested persons was an invitation whereby those whose views were favorable to the maintenance of give-ups had opportunity to comment and present those views.

In this context, it would carry abstraction to aridity to hold that the Commission's procedure lacked fairness because of the lack of opportunity to interested persons to make a presentation to the Commission of views favorable to the maintenance of give-ups.

Appellants' final contention, that of chaos resulting from the abolition of give-ups, is directed more to the wisdom of the Commission's policy than to its power to act. Appellants have not pressed their contentions on the value of give-ups before this court, but are not to be faulted for this because they seek remand to present these points to the Commission. We have considered the need for remand in the preceding discussion. However, we think it necessary to add our views on the limited judicial review available to appellants on the merits of the SEC's give-up policy.

We have given careful consideration to the other grounds for reversal raised by appellants because they concern the statutory authority of the Commission to take action in the area of give-ups, either at all or without following certain prescribed procedures. In essence the plaintiffs, we have held, may seek the court's assistance on the claim that the agency has injected itself, without legal justification, into an area of business relationships and has asked one of the parties to the relationship to terminate or modify it. Plaintiffs' action may be compared to that of a businessman who seeks relief against a threatened interference with a business relationship and expectancy. A can sue B to enjoin B from telling C to exercise C's lawful right to terminate his contract with A or business relationship with A, and plaintiff will succeed if he shows that B has no proper basis for injecting himself into the A–C relationship. *See* Restatement of Torts § 766.

In like vein a businessman may sue to enjoin the SEC from injecting itself, by a request to the Exchange that is *ultra vires*, into a modification of the business relationships between the Exchange and its members, or customers of its members, etc. Air Reduction Co. v. Hickel, 137 U.S.App.D.C. 24, 420 F.2d 592 (1969). And the fact that the SEC's action takes the form of a "Request" does not preclude a judicial determination whether that action was taken outside the scope of the Commission's power.

However, the type of action taken does effect the scope of review where the issue is not power but rather the wisdom of the Commission's policy. If the Commission had ordered the Exchange to abolish give-ups, it would have had to conclude on the basis of evidence before the Commission that give-ups were not consistent with public interest in reasonable commissions. This finding would have been subject to review on the basis of substantial evidence or some equivalent test. On the other hand, the Commission need not make an ultimate finding in order to lodge a preliminary Request with the Exchange, even if the Request is accompanied by certain pressures toward compliance. If the Exchange agrees that the practice should be ended, then the deed is done, even though there has been no agency finding as to its advisability.

In such a case it is obviously impossible to evaluate the outcome of the Request and response on the basis of record evidence. The most that the reviewing court can do is to decide whether there was some factual basis on which the Commission might reasonably believe that the practice of give-ups should be abandoned, and such basis will be presumed to exist unless negatived by the challenger. *Cf.* IAMAW v. National Mediation Bd., 138 U.S.App.D.C. 96, 425 F.2d 527 (January 30, 1970). Since

here the Commission's policy is based, at least in measure, on the inherent inconsistency between the claims of need for minimum rates and the practice of give-ups undercutting such minima, it clearly meets that test.

The judgment of the District Court dismissing the action for lack of jurisdiction is vacated and the cause is remanded with instructions to enter a summary judgment for defendants on the merits.

So ordered.

ROBB, Circuit Judge:

I would affirm the judgment of the district court.

The appellant (plaintiff) Independent Broker-Dealers' Association is an unincorporated group of securities brokers and dealers who are subject to the federal securities laws. The appellants (plaintiffs) Oxford Securities, Inc., and James C. Butterfield, Inc., are broker-dealers registered with the Securities and Exchange Commission. The plaintiffs filed an action against the Commission in the district court seeking (1) a declaratory judgment to the effect that a letter dated August 30, 1968 from the Commission to the New York Stock Exchange (Exchange) was "an unlawful order or direction" depriving plaintiffs of substantial property rights without due process of law, and (2) a mandatory injunction to enjoin the operation and enforcement of this alleged order or direction. In substance the plaintiffs claim that the Commission's letter of August 30, 1968 unlawfully directed the Exchange to change its constitution so as to prohibit customer directed broker's commission sharing ("give-ups") and to adopt a new and reduced minimum broker's commission structure. The New York Stock Exchange is not a party to the action and none of the plaintiffs is a member of the Exchange. The district judge granted the Commission's motion to dismiss for lack of jurisdiction over the subject matter. I think the district judge was right.

In my opinion it is plain from the record that the prohibition of "give-ups" was not the result of a Commission order but was a voluntary act of the Exchange resulting from a request by the Commission pursuant to Section 19(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78s(b) (1964).[1] This appears from an analysis of correspondence between the Commission and the Exchange and from bulletins and releases from the Exchange to its members. Accordingly, I would affirm on the ground stated by the district judge.

The plaintiffs' action is based upon the theory that the Commission's letter of August 30, 1968 was "an unlawful order or direction" from the Commission to the Exchange. In particular, the plaintiffs rely upon the use by the Commission of the word "direction" in describing the Commission's request pursuant to Section 19(b) of the Exchange Act. The plaintiffs contend that under Section 19(b) they were entitled to notice and an opportunity to be heard prior to the issuance of the letter.

The Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78hh (1964) imposes upon the various exchanges the duty of

1. Section 19(b) provides in pertinent part as follows:

"The Commission is further authorized, if after making appropriate request in writing to a national securities exchange that such exchange effect on its own behalf specified changes in its rules and practices, and after appropriate notice and opportunity for hearing, the Commission determines that · such exchange has not made the changes so requested, and that such changes are necessary or appropriate for the pro-tection of investors or to insure fair dealing in securities traded in upon such exchange or to insure fair admintration of such exchange, by rules or regulations or by order to alter or supplement the rules of such exchange (insofar as necessary or appropriate to effect such changes) in respect to such matters, as * * * (9) the fixing of reasonable rates of commission, interest, listing, and other charges; * * * and (13) similar matters."

self-regulation, subject to the surveillance of the SEC. Silver v. New York Stock Exchange, 373 U.S. 341, 352, 83 S.Ct. 1246, 10 L.Ed. 389 (1963); Kaplan v. Lehman Brothers, 250 F.Supp. 562, 564 (N.D. Ill.1966), aff'd, 371 F.2d 409 (7th Cir.), cert. denied, 389 U.S. 954, 88 S.Ct. 320, 19 L.Ed.2d 365 (1967). Pursuant to this statutory scheme Section 19(b) of the Act, 15 U.S.C. § 78s(b) contemplates that the exchanges themselves will effect needed reforms in their rules and practices and that the Commission will issue no rule or order unless an exchange has failed to act. Thus Section 19(b) gives the Commission broad authority to change the rules and practices of an exchange with respect to reasonable rates of commission, interest and other charges; but under that section the Commission can begin no proceeding to exercise its authority unless it first makes an "appropriate request in writing" that an exchange "effect on its own behalf" the particular changes which the Commission thinks desirable. If after notice and opportunity for hearing the Commission determines that the exchange has failed or refused to effect the requested changes and the Commission further determines that the changes are necessary or appropriate, the Commission may then by order direct that the changes be made.

The plaintiffs contend that the Commission's letter of August 30, 1968 was an order under Section 19(b), so that the plaintiffs were entitled to notice and opportunity for hearing with respect to the changes in the rules and practice of the Exchange. I cannot agree. The machinery of a hearing with notice and opportunity to be heard was not required unless and until the Exchange failed or refused to comply with the request of the Commission, made in its letter of May 28, 1968.

In my judgment the correspondence between the Commission and the Exchange and the releases and bulletins issued by them demonstrate that the prohibition of give-ups was the voluntary act of the Exchange, resulting from the Commission's request of May 28. There is no suggestion in the record that the Commission covertly or clandestinely initiated the action of the Exchange in amending its rules with respect to give-ups. On the contrary, it is apparent that long before the letter of August 30, 1968 was written the Exchange was considering the problems generated by customer directed give-ups; and in particular the Exchange was troubled by the impact of such give-ups upon the minimum commission schedule. The concern of the Exchange with respect to these matters was reflected in its proposal of changes in its rate structure, submitted to the Commission on January 2, 1968.

Properly and reasonably the Commission gave public circulation to the Exchange proposals of January 2, 1968, together with a rule proposed by the Commission which would have prohibited investment company managers from directing give-ups; and the Commission invited comments on both proposals. The Department of Justice responded by questioning the need for any minimum commission schedule in the securities business. As a result of this and other comments the Commission ordered an investigation and hearing with respect to commission rate structures, including customer directed give-ups. On the same day, May 28, 1968, the Commission by letter to the Exchange, pursuant to Section 19(b) of the Act, requested that the Exchange "on its own behalf" adopt one of two alternate modifications in its rules concerning minimum commission rates. The first alternative was a revision of minimum commission rates, the second was the elimination of minimum rates on orders in excess of $50,000.

By its letter of August 8, 1968 the Exchange responded to the Commission with its own proposal. Expressing a preference for the Commission's first alternative—the revised minimum rate schedule—the Exchange noted that on June 27 its Board of Governors had approved in principle a volume discount, a step-by-step abolition of customer directed give-ups, and a one-third discount to

nonmember brokers. The Exchange stated, however, that upon further reflection its Board of Governors was convinced that a step-by-step prohibition of customer directed give-ups would be ineffective; that the new minimum commission schedule must include a prohibition of all customer directed give-ups. The Exchange said that this conclusion was reinforced by the frequently expressed belief and urging of the Commission that give-ups should be prohibited, and by the "record of the current hearings concerning customer directed give-ups and the use made of them". Accordingly, the Exchange proposed an amendment to its constitution which would prohibit customer directed give-ups. In addition, certain specific schedules, embodying reduced commission rates, were proposed.

The Commission's letter of August 30, 1968, about which the plaintiffs complain, accepted the Exchange's proposals as a substitute for the first alternative specified in the Commission's letter of May 28. Thereafter, the Board of Governors of the Exchange adopted the proposals and, in accordance with its constitution, submitted them to its members for a vote; and the constitutional amendment prohibiting give-ups was approved by a vote of 925 to 266. There can be no doubt that the Exchange, a private unincorporated organization governed by its own constitution and by-laws, had the power to adopt such rules.

In summary, I think it plain that the Commission's letter of August 30, 1968 did not order the Exchange to do anything; it merely accepted a proposal, formulated by the Exchange on its own behalf and in its own best interest, and submitted in response to the Commission's request of May 28.[2] In this con-

2. On August 8, 1968 the Exchange responded to the Commission's written request of May 28 pursuant to Section 19(b) of the Securities Exchange Act. After noting the two alternatives proposed by the Commission the Exchange stated in part:

"On June 27, 1968, the Board of Governors of the Exchange approved in principle a volume discount, a step-by-step abolition of customer-directed give-ups and a one-third discount to qualified non-member brokers. On August 7, 1968 the Board further considered these questions and now proposes a specific interim non-member commission schedule embodying a reduced rate for volume orders, specific interim intra-member commission schedules embodying across the board reductions, additional language to the Exchange Constitution which would prohibit customer-directed give-ups of work or money in consideration of listed business and a postponement of consideration of non-member access.

"We have carefully considered both of the interim non-member alternatives. We strongly feel that the best interests of the securities industry and the investing public would be served by the maintenance of minimum rates of commission, and therefore we concentrated on alternative (a) rather than alternative (b).

\* \* \* \* \*

"For several years, the Commission has urged the Exchange to prohibit customer-directed give-ups. \* \* \*
"The record of the current hearings concerning customer-directed give-ups, and the use made of them lends further support to the Commission's urgings that such give-ups should be prohibited.
"In its recommendation on June 27, 1968 the Board of Governors approved in principle a step-by-step prohibition of customer-directed give-ups, in order to facilitate the adjustment of members and member firms to the change in the pattern of securities trading which the prohibition is bound to bring about. Further reflection on this point has convinced us that a step-by-step prohibition would not be appropriate.
\* \* \*

\* \* \* \* \*

"The testimony at the hearings makes it clear that the prohibition of customer-directed give-ups to be effective must be all inclusive, applying to give-ups by check or by work. It must also apply to trades both related and unrelated to the customer order which originally provides the funds to be given up. We propose that this be accomplished by

nection it is significant that the Commission's letter of May 28 made no reference to customer directed give-ups; the subject of give-ups was included in the discussions upon the initiative of the Exchange, for reasons which the Exchange fully and clearly explained in its letters and bulletins. The unskillful use of the word "direction" by the Commission in its letter of August 30, referring to its previous request, could not and did not alter the fundamental character and effect of the request of May 28.

The majority finds that there was "agency action" subject to judicial review on the merits. The reasoning is that pressure or urging by the Commission may have exerted an "undue influence" on the decision of the Exchange to abolish give-ups. I cannot accept this theory. The Commission requested a revision of minimum rates. The request was made pursuant to the statutory scheme which contemplates that exchanges will regulate themselves, subject to intervention by the Commission only if they fail to act as requested. True, the Commission had made known its position with respect to give-ups, but it took no action by rule or order on either give-ups or minimum rates. In the absence of any rule or order by the Commission, its amorphous "influence" did not in my judgment convert its request and its acceptance of the Exchange's counter-proposal into "agency action" subject to judicial scrutiny.[3] If this is not so—if our jurisdiction depends upon the degree of Commission "influence"—then almost any Commission request made under Section 19(b) and acceded to by an exchange may be classified as "agency action" and weighed on its merits by the courts. Such

adding to the first paragraph of Article XV, Section I of the Exchange Constitution:

'No member, member firm or member corporation shall in consideration of the receipt of listed business and at the direct or indirect request of a nonmember or by direct or indirect arrangement with a nonmember make any payments or give up any work or give up all or any part of any commission or other property to which such member, member firm or member corporation is or will be entitled.'

"As discussed, the Exchange firmly believes that the rule prohibiting customer-directed give-ups must be an integral part of the proposed interim nonmember commission schedule. Any minimum commission schedule, to be effective, must include a prohibition of all customer-directed give-ups.

\*　　\*　　\*　　\*　　\*

"The proposals in this letter, approved in principle by the Board of Governors of the Exchange at a special meeting yesterday, are the result of much conscientious and diligent effort by all interested parties. It is our strongest hope that the Commission will agree that these proposals will provide the best possible interim solution to the problems facing the securities industry today."

On October 10, 1968 the Exchange issued a bulletin to its membership, recommending the adoption of the proposed constitutional amendment authorizing a new interim commission rate schedule and prohibiting customer directed give-ups. Stating that a "great deal of work and painstaking negotiation has gone into this amendment", the bulletin reviewed the background of the proposal, including the comments of the Department of Justice on the Commission's proposed Rule 10b–10. With respect to the prohibition of customer-directed give-ups the bulletin stated:

"The Board [of Governors] is strongly of the opinion that the minimum commission can be preserved only if customer directed give-ups are abolished. It is not reasonable to argue for retention of minimum commissions and in the same breath defend the give-up practices that have arisen in recent years, and which have been exhaustively described during the SEC hearings. For this reason, the Exchange made the prohibition of customer directed give-ups an integral part of the commission rate proposal to the SEC, even though the SEC had not made such a prohibition part of their May 28 request. Of course, the SEC has been urging all exchanges for several years to prohibit customer directed give-ups."

3. *Cf.* Hearst Radio, Inc. v. Federal Communications Commission, 83 U.S.App. D.C. 63, 167 F.2d 225 (1948) ; Kukatush Mining Corp. v. Securities and Exchange Commission, 114 U.S.App.D.C. 27, 309 F.2d 647 (1962) ; Fay v. Miller, 87 U.S. App.D.C. 168, 183 F.2d 986 (1950).

a result is inconsistent with the statutory scheme for self-regulation by the exchanges. It leads to what I consider an unwarranted intrusion by the courts into matters and proceedings that are not their business.

The application of the theory of the majority to this case puzzles me for another reason. The plaintiffs seek a mandatory injunction to enjoin the operation and enforcement of the alleged order or direction contained in the Commission's letter of August 30, 1968. The plaintiff's target, however, is not the Commission's letter but the amendment to the constitution of the New York Stock Exchange, adopted by vote of its members, which prohibited customer directed give-ups. If the court, after reviewing the Commission's action on the merits, had concluded that it was invalid, could the court have set aside the Exchange's constitutional amendment? I think the obvious answer is no, since the Exchange is not a party to this action and has never been heard. This being the case, I am unable to see any occasion for the district court to consider the issuance of an injunction.