**HUBBARD RICHARD COMMUNITY COUNCIL, Walter H. Lubienski, and Commodities Export Company, a Michigan Corporation, Plaintiffs,**

v.

**CITY OF DETROIT, a Municipal Corporation, Detroit International Bridge Company, a Michigan Corporation, Ammex, Inc., a Michigan Corporation, U.S. Immigration and Naturalization Service, a U.S. Government Agency, and U.S. Customs Service, a U.S. Government Agency, Defendants.**

No. 93–74278.

United States District Court,
E.D. Michigan,
Southern Division.

Oct. 6, 1995.

William H. Goodman, Goodman, Eden, Millender & Bedrosian, Detroit, MI, for plaintiffs.

Walter H. Lubienski, Dearborn, MI, pro se.

Roger E. Craig, Naples, FL, for Walter H. Lubienski.

Sharon–Lee Edwards, Detroit, MI, for City of Detroit.

## AMENDED OPINION AND ORDER

FEIKENS, District Judge.

### I. INTRODUCTION

The various plaintiffs in this case have protested the City of Detroit's closing of several streets and alleys near the Ambassador Bridge, a privately owned thoroughfare connecting Detroit and Windsor. In essence, they claim that the closings were improperly engineered by the defendants, to the detriment of the plaintiffs.

In an opinion dated June 21, 1994, I addressed the sufficiency of the plaintiffs' various alleged causes of action. The following claims survived that decision: an abuse of discretion claim against the City of Detroit for circumventing its own policies to effectu-ate the closing of the streets; a claim that Ammex and DIBCO defrauded the City of Detroit by failing to disclose the true, self-serving purpose behind their request for the street closings; and a claim that the defendant United States Customs Service's ("Customs") and the defendant United States Immigration and Naturalization Service's ("INS") acted improperly by striking a secret deal with the Detroit International Bridge Company ("DIBCO") and Ammex [1] which resulted in the allegedly wrongful action by the City of Detroit. Customs and INS ("the federal agencies") also are alleged to have participated in defrauding the City of Detroit in order to get the streets surrounding the bridge closed, which was a prerequisite to the consummation of the alleged deal with DIBCO.

In June, when I denied the federal agencies' motions to dismiss the plaintiffs' claim that the agencies engaged in improper "agency action", as defined by the Administrative Procedure Act ("APA"), for lack of jurisdiction, I assumed, arguendo, that the plaintiffs' construction of the facts was correct, noting that the plaintiffs should be given an opportunity to further develop their case through discovery. Extensive discovery has since been taken, and the various defendants in this case have submitted motions for summary judgment.

To date, only the federal agencies have had the opportunity to orally present their arguments in support of summary judgment to the court. Hearing of the other defendants' arguments was adjourned until I could resolve the issues bearing on the federal agencies' motions. This was deemed to be appropriate because the question whether "final agency action" exists, as defined by the APA, was again raised. This issue bears on whether this court has subject matter jurisdiction. The federal agencies read my prior opinion as only tentatively recognizing jurisdiction, subject to further scrutiny after discovery. Because it was not clear whether I could retain supplemental jurisdiction of the state law claims against the City of Detroit, DIBCO, and Ammex if the federal defendants are dismissed from this litigation for

---

1. Allegedly, the owner of Ammex, Manuel J. Mar-oun, also co-owns DIBCO.

want of jurisdiction, it was agreed that the agencies' motion should be decided prior to conducting a hearing of the other defendants' motions.

Before addressing the disposition of the plaintiffs' claims against the agencies, a review of the events and circumstances underlying the dispute is in order.

## II. FACTS

Plaintiff Commodities Export Company ("CEC"), presided over and partly owned by plaintiff Lubienski, operates two duty-free stores near the Ambassador Bridge ("the Bridge"); one is located at 21st and Porter streets and the other is at the Fisher Freeway Service Drive at Howard. CEC competes with Ammex, Inc., which also operates duty-free stores in the same vicinity, for the business of consumers preparing to cross over the Bridge into Canada. Prior to July of 1993, the "2–stop shop" system of delivery of goods to customers was employed by Ammex at both its West Lafayette Street store and its store on the Ambassador Bridge plaza, and by CEC at its Fisher Freeway Service Drive store.[2] Under this system, customers of Ammex's two stores did not receive their goods at the stores where goods were selected and the purchase price was paid, but instead received their goods only after passing through toll booths on the Ambassador Bridge plaza and then making a second stop at an Ammex warehouse located on the plaza; customers of CEC's Fisher Freeway Service Drive store are required to make a second stop at CEC's Porter Street store to receive their goods.[3] The two-stop system causes customers to suffer the inconvenience of a second stop at the delivery point, and serves as a precaution to help ensure that duty-free purchases are exported rather than routed immediately back into the United States, as required by Customs. This mode of delivery was used by both Ammex and CEC for many years.

This situation changed in 1993 and 1994. In July of 1993, Customs granted Ammex permission to function as a "1–stop shop" at Ammex's store on the Ambassador Bridge plaza. Customers at that store are no longer required to make a second stop at the Ammex warehouse, located further along the plaza, to receive their merchandise, but receive it at the point of purchase. In December of 1993, Customs granted Ammex tentative permission to operate as a "1–stop shop" at its West Lafayette Street store. Customs granted final approval for such operations in April of 1994. Customers of Ammex's West Lafayette Street store now pass through toll booths to enter the compound, where they then make their purchases and receive their goods on-site.

Ammex's "1–stop shop" option had been enabled by the construction of a "secured access roadway" near its store. This secured access roadway provides a means for the INS to channel vehicles denied access to the United States back to Canada without disrupting traffic coming and going to and from the Bridge. The roadway is "secure" in the sense that cars sent through it have no opportunity to exit into the United States, but must proceed to Canada. Customers from Ammex could be routed to the nearby roadway with their purchases; with proper security measures taken by Ammex to ensure that traffic entering its compound had no alternative to exiting via the secured access roadway, Customs was satisfied that duty-free goods bought and delivered at the store would go to their intended destination. Therefore, the agency no longer deemed it necessary to require Ammex customers to pick up their merchandise beyond the first stop; they could simply pick it up at the point of purchase and be on their way. This option is not available to CEC at its Fisher Freeway Service Drive store because it is not located where it can take advantage of the secured access roadway; thus, it continues with the 2–stop system of delivery.

Obvious competitive advantages accrued to Ammex vis a vis CEC. Naturally, Lubienski and company were not pleased by this development; substantially, it constitutes the

---

**2.** At CEC's Porter Street store, CEC delivers goods to its customers outside the store, in the CEC parking lot.

**3.** The stop at the Porter Street store precedes passage through the toll booths on the bridge.

harm for which plaintiffs seek redress in this lawsuit [4].

The plaintiffs do not view the harm they have suffered as a mere incidental effect of the construction of the secured access roadway for legitimate purposes. Instead, they maintain that the project itself was illegitimately conceived and brought into being. All of the defendants are alleged to have participated in this illicit endeavor.

The defendant agencies, which admittedly had a valid reason for desiring the construction of this roadway, stand accused of using improper influences to obtain it without having to pay for it in violation of § 706 of the Administrative Procedure Act ("APA"). In January of 1993, INS sent a letter to the owner of the Bridge, DIBCO, formally requesting that it undertake the project. Customs also sent a letter to DIBCO expressing its concurrence. The plaintiffs viewed this joint request as agency action in the sense that it was the agencies' invitation to DIBCO to strike a deal consisting of the following terms: the agencies would get their secured access roadway in exchange for INS' promise to not carry out an alleged "threat" to close the Bridge down, as it is empowered to do, and Customs' grant of 1–stop shop privileges to Ammex. Both agencies allegedly also helped to trick the Detroit City Council into closing city streets so that they could be converted into the planned secured access roadway which would be accessible to Ammex.

## III. LAW AND ANALYSIS

The defendant agencies have launched a two-pronged attack in their motion for summary judgment. First, as noted, they maintain that the plaintiffs have failed to show that INS or Customs ever took "final agency action" to influence DIBCO into building the secured access roadway and to convince the Detroit City Council to close streets for that project. Second, they argue that no genuine issues of material fact exist as to whether the agencies acted improperly because no evidence of a secret deal between them and DIBCO has been put forth by the plaintiffs. While the first one is without merit, the second one is sound.

I am satisfied that "final agency action" has been shown and that this court therefore has subject matter jurisdiction over the claims against the federal agencies [5]. It is clear that the agencies were directly involved in the planning and construction of the secured access roadway which led to the street closings at issue.

A case decided by the D.C. Circuit is directly on point. In *Independent Broker–Dealers' Trade Association v. Securities and Exchange Commission*, 442 F.2d 132, 137–141 (D.C.Cir.1971), final agency action was found in the form of a "request" made by the Securities and Exchange Commission ("SEC"), not unlike the request made to DIBCO by the federal agencies here.

*Independent Broker–Dealers' Trade Association*, 442 F.2d at 135–137, involved the New York Stock Exchange's ("NYSE's") voluntary abandonment of a compensation practice which the SEC desired to have abolished, preferably voluntarily. The practice, known as "give-ups" allowed institutional investment managers to direct securities brokers to surrender part of their compensation to brokers who were not connected with the transaction, but performed research services for the institution. The SEC saw this as

---

4. Plaintiff Hubbard Richard Community Council ("HRCC"), a non-profit corporation representing residents and businesses within the area of the street closings, seeks redress for a different type of "injury" in this lawsuit, which relates to the claim against the City.

5. The requirement that there be final agency action to support the right to judicial review is based on the following provisions of the APA:

[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of

a relevant statute, is entitled to judicial review thereof.
5 U.S.C. § 702
and
Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review.
5 U.S.C. § 704
Agency action is defined as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act ..." 5 U.S.C. § 551(4).

creating a conflict of interest potential for managers of mutual funds, and also believed it undermined the NYSE's minimum rate structure. It had indicated publicly that it was considering regulating give-ups away. The SEC issued a request letter to the NYSE that it either amend its minimum rate schedule or eliminate it entirely. Apparently, the NYSE placed great value on a minimum rate schedule, and wanted to avoid losing it. In its letter, the SEC also mentioned its concern with the give-up problem, which was entangled with the minimum rate problem. The Exchange voluntarily offered to get rid of the give-ups and to keep a revised minimum rate schedule. Plaintiffs were upset because they were beneficiaries of the give-ups, and saw the "request" as essentially an order to the NYSE (in that the implied threat of losing the minimum rate schedule altogether was there if the give-ups continued). They saw this as improper rule-making, because there had been no formal hearings.

■ The agency action in this case is strikingly similar to what occurred in *Independent Broker–Dealers' Trade Association*. In both cases, a private party was asked to voluntarily take the initiative to reach a result that the agency(ies) desired. In both cases, the agency had the power to take something of great value away from the private party if it did not do as the agencies asked (in the D.C. case, it was minimum rate schedules; in this case, it is the ability to continue operating the Bridge). In both cases, a third party suffered economic injury and complained under the APA.

Although it was not persuaded that the SEC had issued a mandate in the form of a request, the D.C. Circuit justified taking jurisdiction by looking at the practical effect of the request letter on the behavior of the Exchange, writing:

> we look at the events more broadly, and conclude that the Commission was significantly involved in the Exchange's decision to prohibit give-ups, and involved in a way and to an extent that cannot be ignored as devoid of legal materiality. This involvement of a government agency is meaningful enough to call for application of vital

principles of judicial review, to consider appellants' claim that the action was not lawfully taken. **We sustain jurisdiction in the District Court on the ground that this agency involvement constitutes 'agency action' within the meaning of the Administrative Procedure Act, 5 U.S.C. §§ 702, 704 (1964), and alternatively by reference to the court's general equity jurisdiction.**

442 F.2d at 137 (emphasis added).

Similarly, although the federal agencies are quite correct in pointing out that there is no evidence to support the notion that the request made of DIBCO amounted to a mandate per se, it cannot be denied that the government agencies were meaningfully involved in the secured access roadway project and the street closings that ultimately resulted. Therefore, using the rationale supplied in *Independent Broker–Dealers' Trade Association*, I find that there was agency action in this case.

■ Furthermore, the action taken by the INS and Customs was final such that this court has subject matter jurisdiction over the claims against the agencies. As noted by the D.C. Circuit, which referenced the Supreme Court precedent of *Columbia Broadcasting System, Inc. v. United States*, 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942), finality and reviewability of agency actions depends not on whether they are issued as regulations or orders but on whether "the consequence and contemplation of 'expected conformity,' is unmistakable." 442 F.2d at 141. This test is satisfied here.

However, this is not to say that the request rises to the level of an actionable threat. The court in *Independent Broker–Dealers' Trade Association* was careful to point out that it was not saying that the Exchange's actions were in fact involuntary, but "[w]hat we are saying is that the use of ... pressures by the Commission amounts to more than a mere invitation to voluntary compliance, and carries with it both an element of undue influence and sufficient dangers of intrusions into matters beyond the scope of the Commission's power as to require some judicial review of their propriety." 442 F.2d at 142. It is the danger of

wrongful agency intrusion that requires judicial review; this does not amount to finding that there was actionable wrongdoing, as the plaintiffs would have me hold.

The federal agencies' second argument is more to the point. They note that under § 706 of the APA, the plaintiffs must show that the agency action at issue falls into one of the following categories: (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) contrary to constitutional right, power, privilege or immunity; (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (4) without observance of procedure required by law; or (5) unwarranted by the facts to the extent that the facts are subject to trial *de novo* by the reviewing court.

■ Clearly, the agencies' action did not fall under (2) or (3) above. They were within their rights in discussing the possibility of a secured access roadway project with potential underwriters; the owners of the Bridge were the logical candidates, since they stood to benefit from a method of returning those refused access to the United States which would be nondisruptive of Bridge traffic and operations. Nor were the agencies without power to effectuate changes in methods of obtaining compliance with Customs and INS regulations. Just as the court in *Independent Broker–Dealers' Trade Association,* found the plaintiff's claims that the SEC had no power to alter the minimum rate schedule or order the abolition of give-ups after about 28 years of "tacit consent" patently frivolous, 442 F.2d at 143, plaintiffs' parallel argument that after 30 years, the agencies lack power to make changes in the procedures employed relating to operations around the Bridge is clearly without merit.

■ Nor does it appear that the plaintiffs can rely on (4) above. They have failed to indicate what procedures the agencies omitted which were required by law. Moreover, I agree with the D.C. Circuit that there is room for some flexibility within bureaucracy, for

> to hold that such [informal agency requests] ... falling short of an Order, re-

quires absolute adherence to the procedures set forth ... for a mandatory order, would be to eliminate the mechanism of informal agency action, and response thereto ... **There is room in responsible government to achieve results in the public interest through requests of industry, without the use of mandate or procedures of mandate ...**
442 F.2d at 144

■ Finally, the agencies are quite correct in their observation that the plaintiffs have utterly failed to show that the agency's action was unwarranted by the facts as required to fall under (5) above. The plaintiffs appear to concede that the agencies had a legitimate reason for desiring that the secured access roadway be constructed by DIBCO.

■ I must conclude that if plaintiffs' claims were to proceed to trial, the claim against the agencies would have to be grounded in § 706's prohibition of "arbitrary and capricious" agency action. This standard requires this court to uphold agency action that is reasonable. *Goldin v. F.D.I.C.,* 985 F.2d 261, 263 (6th Cir.1993). This deferential standard must be taken into account when considering a motion for summary judgment. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

■ Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." While the movant for summary judgment bears the initial burden of showing that there is no genuine issue as to any material fact, when the nonmovant bears the ultimate burden of proof if and when the case should proceed to trial, the movant may satisfy his or her burden by pointing to the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–2553, 91 L.Ed.2d 265 (1986). If this is done, then the nonmovant is required to go beyond the pleadings and put forth specific

facts showing that there is a genuine issue for trial. 477 U.S. at 324, 106 S.Ct. at 2553.

 I find there is no genuine issue of material fact as to whether INS and Customs improperly coerced or seduced DIBCO into a deal. The plaintiffs rely solely on speculation. They infer that DIBCO must have been party to a deal, because it would not have financed the secured access roadway project for nothing. They also rely on so-called "circumstantial evidence", such as the temporal proximity of the closings with the goings-on between DIBCO and the agencies. The defendants, however, have gone beyond their burden to point out an absence of a genuine issue of fact as to whether the agencies acted wrongfully. They offer reasonable explanations for what occurred: DIBCO wanted the secured access route because it had an interest in preventing disruption of Bridge traffic and that Customs had no reason to deny the grant of 1–stop shop status to Ammex as an incidental benefit of the larger project. Moreover, they support their case with evidence that there was no illicit deal; Customs Director William Morandini testified on deposition that DIBCO offered to construct the secured access roadway without indicating that it wanted anything in return. *See* Deposition at 20.

In the absence of any solid evidence by the plaintiffs of a wrongful "deal" or "conspiracy" between the agencies and DIBCO, I am compelled to grant the federal agencies' motion for summary judgment. *See First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592–1593, 20 L.Ed.2d 569 (1968) (holding that when the petitioner's proof of conspiracy lacked probative force and the respondent's evidence showed the absence of any conspiracy, summary judgment was proper.) This conclusion is bolstered by the applicable deferential standard of review and the reasonable, supported explanations proffered by the federal agencies as to what occurred in this case.

While I can sympathize with plaintiffs for the economic downturn they have suffered, this does not meant that a legal remedy is available to them. It may be said in this case that Lubienski and CEC

developed a business opportunity out of a practice of the [agencies]. They took the risks, so far as procedure was concerned, that the [agencies] might change that policy without either consulting them or following any procedure that gave them voice.

442 F.2d at 144.

There remains for resolution the claims against the City and Ammex and DIBCO. Exercising the pendent jurisdiction which attached to these claims, this court will hear the remaining motions for summary judgment forthwith. *See United Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

## IV. CONCLUSION

For the reasons set forth above, the federal agencies' motions for summary judgment are hereby granted, and hearings of the remaining defendants' motions for summary judgment shall be had within this court forthwith.

IT IS SO ORDERED.